567 A.2d 630

**Honorable Lucien BLACKWELL, Member City Council of Philadelphia, Honorable David Cohen, Member City Council of Philadelphia and Honorable Francis Rafferty, Member City Council of Philadelphia, Appellees,**

v.

**COMMONWEALTH of Pennsylvania, STATE ETHICS COMMISSION, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 23, 1989.

Decided Dec. 13, 1989.

348

Vincent J. Dopko, Harrisburg, Ernest D. Preate, Atty. Gen., Jules S. Henshell, Deputy Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., for appellant.

Charles W. Bowser, James P. Cousounis, Philadelphia, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT and ZAPPALA, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

The appellant herein is the Commonwealth State Ethics Commission (the "Commission"), which was created by section 6 of the Act of October 4, 1978, P.L. 883, No. 170, 65 Pa.Stat.Ann. § 406 (Purdon's Supp.1989). Appellees are the Honorable Lucien Blackwell, the Honorable David Cohen

and the Honorable Francis Rafferty, all members of the City Council of Philadelphia.

By letters of June 19, 1987, the Executive Director of the Commission notified each appellee that he was under investigation pursuant to a sworn complaint alleging a violation of section 3(a) of the Public Officials Ethics Act (the "Ethics Act"), 65 Pa.Stat.Ann. § 403(a).[1] The alleged violation was that each member had hired his wife to work in his city council office.[2]

Appellees, through legal counsel, objected to the Commission's investigation on the grounds that, inter alia, it lacked jurisdiction over appellees by virtue of the Philadelphia Home Rule Charter (351 Pa.Code § 1.1–100) which, appellees argued, preempted the field relating to matters of ethics involving Philadelphia officials. The Commission was unimpressed by this preemption argument, and it continued its investigation.

On September 13, 1988, appellees filed in the Commonwealth Court a Petition for Review in the Nature of an Action for Declaratory Judgment and Action in Equity, which petition sought a declaration that, inter alia, the Philadelphia Home Rule Charter preempted the provisions of the Ethics Act with regard to the conduct of Philadelphia officials and therefore deprived the Commission of jurisdic-

1. Section 403(a) provided, at the times relevant to this appeal, as follows:

 **Restricted activities**
 (a) No public official or public employee shall use his public office or any confidential information received through his holding public office to obtain financial gain other than compensation provided by law for himself, a member of his immediate family, or a business with which he is associated.

2. We do not reach the merits of this allegation, and we express no opinion on whether hiring one's spouse to work in his or her office would violate section 3(a) of the Ethics Act as it then existed. We note, however, that the language of section 3(a) would seem to specifically authorize such a practice, to-wit "No public official ... shall use his public office ... to obtain financial gain *other than compensation provided by law for himself, a member of his immediate family....*" It has not been asserted that appellees' wives received any compensation for their professional services other than "compensation provided by law."

tion to investigate appellees. This petition for review also sought to enjoin the Commission from conducting an investigation or any proceedings regarding appellees' ethics or conduct. The Commission filed preliminary objections seeking to dismiss the petition for review on the grounds that appellees had a "full, complete and adequate remedy at law," namely the administrative proceedings before the Commission with the right to appeal an adverse determination, that the administrative proceedings were still pending, and that appellees failed to make service of the petition for review on the Attorney General as required by Pa.R.A.P. Rule 1514(c).

The Commission denied appellees' request to stay further proceedings and investigation pending the Commonwealth Court's resolution of the petition for review. Subsequently, on or about September 29, 1988, the Commission served a subpoena upon the First Pennsylvania Bank in Philadelphia requiring a custodian of the bank to appear at the Commission's offices in Harrisburg on October 11, 1988 and to produce all records regarding the bank accounts of Lucien Blackwell and/or his wife, Jannie Blackwell.

Appellee Blackwell was advised by the bank on October 4, 1988 that it had received said subpoena and would comply with it. The following day, appellees filed in Commonwealth Court an Application for Special Relief In the Nature of a Preliminary Injunction seeking to enjoin the Commission from taking any further action in connection with its investigation of appellees, and on October 7, 1988, appellees filed an Application for Special Expedited Relief in the Nature of a Temporary Restraining Order and Protective Order repeating the request for injunctive relief, and also asking the court to quash the subpoena to First Pennsylvania Bank. On October 11th, Senior Judge Emil E. Narick stayed the subpoena pending a hearing on the petition for a preliminary injunction, and denied the request to enjoin the Commission from further investigation or other action.

On October 20th, the court held a hearing on the application for preliminary injunction before Judge Doris A. Smith.

On October 25th, 1988, Judge Smith issued the order which is the subject of this appeal. This Order of October 25, 1988 (a) stayed the subpoena served upon First Pennsylvania Bank "pending disposition by this Court of preliminary objections to [Appellee's] petition for review in the nature of action for declaratory judgment and action in equity ...," and (b) denied appellees' "request to enjoin the State Ethics Commission from continuing its investigation in this matter ... inasmuch as Council Members have not satisfied criteria for the granting of a preliminary injunction."

The Commission timely filed an appeal from that portion of this order of October 25, 1988 which stayed the subpoena and, as required by Pa.R.A.P. Rules 909 and 910, filed a jurisdictional statement asserting that the stay order "effectively granted a preliminary injunction" of the investigation, and was therefore immediately appealable under 42 Pa.C.S.A. §§ 723(a), 5105(c) and Pa.R.A.P. Rule 311(a)(4). On December 16, 1988, this Court noted probable jurisdiction, and the case was scheduled for briefing and listed for oral argument on direct appeal.

Meanwhile, on December 14, 1988, the Commonwealth Court proceeded to hear argument en banc on the Commission's preliminary objections to appellees' petition for review seeking declaratory and injunctive relief. On April 7, 1989, 125 Pa.Cmwlth. 42, 556 A.2d 988, the Commonwealth Court, in an opinion by President Judge James Crumlish, Jr., dismissed the Commission's preliminary objections to said petition, holding that the relief sought was available to appellees under the Declaratory Judgments Act, 42 Pa.C. S.A. §§ 7531–7541, despite the pendancy of proceedings before the Commission, and also dismissed the preliminary objection based on alleged improper service.

A concurring opinion was filed by Judge James Gardner Colins, joined by Judge Francis A. Barry. The concurring opinion pointed out, sua sponte, that there was at least a serious question as to whether the Commission was lawfully in existence when it issued the subpoena to First Pennsylvania Bank in September, 1988 and throughout its investi-

gation of appellees after June 30, 1988. Judge Colins pointed out that the Commission had been scheduled to go out of existence on December 31, 1987 by operation of the Sunset Act of 1981, Act of December 22, 1981, P.L. 508, No. 142, *as amended,* §§ 1–14, 71 Pa.Stat.Ann. §§ 1795.1–1795.- 14 (Purdon's Supp.1989). The actual date of termination would have been June 30, 1988 because of the six-month "wind up" provision of section 6(f), 71 P.S. § 1795.6(f). Although the life of the Commission had been ostensibly extended until December 31, 1988 by resolution of the "Leadership Committee" pursuant to section 4(4) of the Sunset Act, 71 P.S. § 1795.4(4), the concurring opinion expressed the belief that this extension was "unconstitutional, as it allows a group of six (6) persons [i.e., the Leadership Committee] to legislate in place of the full House and Senate. Such a practice allows the circumvention of the established procedures governing the adoption of resolutions. *See* Article II, § 1; Article III, §§ 1, 4, 5, 8 and 9; Article V, § 15, of the Pennsylvania Constitution." Pa.Cmwlth. at ——, 556 A.2d at 992. The concurring opinion further observed that, under this view, the Commission had gone "out of existence ... [and had] no jurisdiction to continue this or any other investigation." *Id.* at ——, 556 A.2d at 992.

On June 7, 1989, appellees filed with this Court an Application to Quash the Appeal for the reasons stated in Judge Colins' concurring opinion, arguing that the Commission has no standing to pursue the appeal because it had ceased to exist as of June 30, 1988, due to the operation of the Sunset Act and the unconstitutional and ineffective extension of the life of the Commission by the Leadership Committee. The Commission disputes appellees' contention that the extension of the life of the Commission by the Leadership Committee was unconstitutional; instead the Commission asserts that the one year extension was not an exercise of "legislative power" but was, rather a mere procedural, administrative mechanism which could be exercised by committee.

■ We agree with appellees that the extension of life granted the Commission by the Leadership Committee was an unlawful exercise of the legislative power that was unlawfully delegated to the Leadership Committee by section 4(4) of the Sunset Act, and, for the reasons to follow, that the Commission had no jurisdiction or authority to pursue the investigation of appellees at times relevant to this appeal, or for that matter, to pursue the appeal. Accordingly, we will grant the motion to quash the appeal. Some background information is necessary.

*The State Ethics Commission*

The Commission was established on January 1, 1979, as part of the Public Officials' Ethics Act. 65 Pa.Stat.Ann. §§ 401–413. The Ethics Act required statements of financial disclosure to be filed annually by public officials and prohibited certain activities by public officials that might present a "conflict [or] the appearance of a conflict with the public trust." 65 P.S. §§ 404 and 403. The Commission was created to implement, administer and enforce the Ethics Act, and was composed of seven members appointed by members of the General Assembly and by the Governor. 65 P.S. §§ 407 and 406.

*The Sunset Act*

With the passage of the Sunset Act in 1981, Pennsylvania joined some 35 states that had enacted "sunset" legislation since the mid–1970s. 71 Pa.Stat.Ann. §§ 1795.1–1795.14. The Sunset Act established comprehensive mechanisms for the legislative review and evaluation of 74 named Commonwealth agencies, and provided that these 74 agencies "shall terminate all activities and shall go out of existence" on either December 31, 1983, December 31, 1985, or December 31, 1987. 71 P.S. § 1795.6(a), (b) and (c). However, agencies terminated as scheduled were given until June 30th of the following year to "wind up their affairs." 71 P.S. § 1795.6(f). Any agency created after January 1, 1981 was required to "be scheduled for termination at the conclusion

of the tenth year following its creation unless otherwise specified...." 71 P.S. § 1795.8.

Termination of Commonwealth agencies is thus mandated by the Sunset Act *in the absence of legislative action* in the manner that is also provided therein. Section 3 of the Sunset Act creates a Leadership Committee, a joint committee of six members of the General Assembly composed of the Speaker of the House of Representatives, the President pro tempore of the Senate and the Majority and Minority Leaders of the House and the Senate. 71 P.S. § 1795.3. Section 4 of the Sunset Act 71 P.S. § 1795.4, sets forth the powers and duties of the Leadership Committee which include: to direct and coordinate the implementation of the sunset review procedure; to assign the primary responsibility for review and evaluation to an appropriate standing committee of the House or the Senate; to monitor the review and evaluation process by the designated standing committee, and to reassign the task if necessary to another standing committee; and to assign certain tasks to the Legislative Budget and Finance Committee (which committee is also required to prepare a report and "performance audit" for each agency scheduled for termination.) Section 5, 71 P.S. § 1795.5, sets forth additional criteria and guidelines for the review and evaluation by the standing committees of the agencies slated for termination.

Sections 4 and 5, 71 P.S. §§ 1795.4 and 1795.5, contain specific timetables for completion of the required review and evaluation by the various legislative committees involved in that process (i.e., the Leadership Committee, the standing committees, the Legislative Budget and Finance Committee). This evaluation and review process is intended to provide the full legislature with sufficient, timely information to determine whether or not the agency will be terminated as scheduled. The General Assembly may reestablish any agency scheduled for termination for a period of ten years (unless otherwise specified in the reestablishing legislation.) Section 7, 71 P.S. § 1795.7. Unless reestablishing legislation is enacted prior to November 1st of an

agency's scheduled termination year, the presiding officer of each chamber is directed to place on their calenders for the first legislative day in November a resolution "whether an agency scheduled for termination on December 31 of that year shall be continued." Section 7(b), 71 P.S. § 1795.7(b). A majority of the members of each chamber may then approve a resolution prior to the scheduled termination date of December 31st, in which case "the agency shall be continued until the next review and termination cycle scheduled for said agency." *Id.*

In addition to the above provision for bicameral legislative continuation of the life of an agency "until the next review and termination cycle scheduled for said agency," section 4(4) of the Sunset Act contains the following provision which concerns us today:

> The [Leadership Committee] shall have the power and its duty shall be:
>
> . . . . .
>
> (4) To authorize, if necessary, a postponement of the review or termination of any agency for a period not exceeding one year.

Thus, six members of the General Assembly are authorized by section 4(4) of the Sunset Act to extend the life of an agency if those six members deem it "necessary," even though the full House and Senate failed to reestablish the agency or exercise the bicameral continuation mechanism of section 7(b). In the absence of reestablishment or extension by one of the statutory continuation mechanisms, an agency will terminate as scheduled after the additional six month period automatically provided to wind up its affairs, unless the "General Assembly passes a law to the contrary" during that period. Section 6(f), 71 P.S. § 1795.6(f).

*The State Ethics Commission and the Sunset Act*

The Commission was scheduled to "go out of existence" on December 31, 1987. Section 6(c), 71 P.S. § 1795.6(c). In the absence of legislative action reestablishing or extending the life of the agency (following the required review and

evaluation), the Commission would have completely ceased to exist as of June 30, 1988. The primary review and evaluation responsibilities were assigned to the House Judiciary Committee, which submitted its written report. The Legislative Budget and Finance Committee submitted its performance audit. Nevertheless, the legislature did not act to reestablish the committee.

The full legislature failed to utilize the continuation mechanism of section 7(b) to extend the life of the commission. The six member Legislative Committee, however, passed a resolution on December 15, 1987, exercising its authority under section 4(4) to postpone the termination of the Commission until June 30, 1988. On June 29, 1988, the Leadership Committee passed a second resolution exercising its authority under section 4(4) to postpone termination of the Commission until December 31, 1988. (The Leadership Committee is authorized to postpone termination under section 4(4) "for a period not exceeding one year.") As no legislation reestablishing the Commission was enacted on or before December 31, 1988, the wind up provision of section 6(f) was automatically triggered which would have completely terminated the Commission on June 30, 1989.

On June 26, 1989, the General Assembly passed Act 9 of 1989 which reenacted and substantially amended the Act of October 4, 1978 which created the Commission. Thus the Commission was reestablished as of June 26, 1989 by the legislative action of both chambers of the General Assembly.

*Constitutionality of Section 4(4) of the Sunset Act*

The appellees challenge, by their motion to quash this appeal, the jurisdiction of the Commission to pursue their investigation of appellees or to prosecute this appeal. Indeed, the motion to quash challenges the very existence of the Commission after June 30, 1988. This challenge is predicated on the alleged improper exercise of the legislative power by the Leadership Committee.

■ Initially we note that, although this issue was not raised by appellees prior to their motion to quash, the issue has not been waived nor is it waivable. This is an issue of jurisdiction in its most fundamental sense, for if the Commission was "out of existence" when it issued the subpoena for First Pennsylvania Bank on or about September 29, 1988 and when it appealed the Commonwealth Court's order of October 25, 1988 to this Court, then it had no jurisdiction to issue said subpoena, or conduct any investigation, or to take *any legal action* between June 30, 1988 and June 26, 1989 (when it was reestablished by the Legislature). If the Commission did not exist during that period, any actions which it performed therein must be deemed as null and void and without legal effect. As with any issue going to the subject matter jurisdiction of a court or administrative tribunal to act in a matter, this is an issue that cannot be waived by the parties nor can the parties confer subject matter on a court or tribunal by agreement or stipulation. *See Commonwealth v. Khourey*, 521 Pa. 1, 555 A.2d 100, 109 n. 15 (1989) *and In Re Casale*, 512 Pa. 548, 552, 517 A.2d 1260 (1986). Since an issue of subject matter jurisdiction is not waivable, it may be raised at any stage of a proceeding by a party, or sua sponte by the court or agency. *Commonwealth v. Little*, 455 Pa. 163, 167, 314 A.2d 270, 272 (1974).

We also reject, preliminarily, the Commission's argument that it would be an improper exercise of this Court's "extraordinary jurisdiction" to address the constitutional challenge to the Leadership Committee's actions. 42 Pa.C.S.A. § 726 ("Extraordinary jurisdiction"). The Commission frames this issue as follows:

[Appellees] suggest the issue before the Court is whether the [Commission] lacks standing to make an appeal based on the assumption that the agency has "sunsetted". The instant appeal relates to an Order of the Commonwealth Court which stayed [a Commission] subpoena. Therefore, in order for this Court to hear the

issue of standing, extraordinary jurisdiction must be exercised.

Brief of Appellant in Support of its Answer in Opposition to the Application to Quash the Appeal, at 23. With this issue thus framed, the Commission argues that the predicates for exercise of our extraordinary jurisdiction (*see Philadelphia Newspapers, Inc. v. Jerome*, 478 Pa. 484, 387 A.2d 425 (1978), *appeal dismissed* 443 U.S. 913, 99 S.Ct. 3104, 61 L.Ed.2d 877 (1979)) are lacking, and that we should therefore deny the motion to quash.

 This argument is flawed in its fundamental assumption that, in order to address the issue of the Commission's "standing" premised upon the constitutional challenge to the Sunset Act, we must exercise extraordinary jurisdiction. The flaw is that we already have jurisdiction in this case by virtue of the Commission's direct appeal from the Commonwealth Court's Order of October 25, 1988. The Commission predicated this appeal on the Judicial Code and the Rules of Appellate Procedure, 42 Pa.C.S.A. §§ 723(a), 5105(c) and Pa.R.A.P. Rule 311(a)(4), and it is highly inconsistent with the Commission's statement of jurisdiction to now suggest that we have none and that we must do an *extraordinary* act to obtain jurisdiction. There is nothing extraordinary about addressing an issue of subject matter jurisdiction that has been raised, albeit belatedly, by one of the parties before this Court on direct appeal from an intermediate appellate court. We will therefore address the merits of that issue.

Article II, section 1 of the Pennsylvania Constitution provides, in plain and unambiguous language:

The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives.

 The "legislative power" in its most pristine form is the power "to make, alter and repeal laws." *In Re Marshall*, 363 Pa. 326, 337, 69 A.2d 619 (1950); *Mt. Lebanon v. County Board of Elections*, 470 Pa. 317, 368 A.2d 648 (1977). It is *axiomatic* that the Legislature cannot consti-

tutionally delegate the power to make law to any other branch of government or to any other body or authority. *Gilligan v. Pennsylvania Horse Racing Commission*, 492 Pa. 92, 95, 422 A.2d 487 (1980), *citing State Board of Chiropractic Examiners v. Life Fellowship of Pennsylvania*, 441 Pa. 293, 293, 297, 272 A.2d 478, 480 (1971); *Archbishop O'Hara's Appeal*, 389 Pa. 35, 131 A.2d 587 (1957). The legislature may, consistent with this constitutional axiom, delegate authority and discretion in connection with the execution and administration of a law; it may establish primary standards and impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the enabling legislation. *Belovsky v. Redevelopment Authority*, 357 Pa. 329, 342, 54 A.2d 277, 284 (1947); *Chartiers Valley Joint Schools v. Alegheny County Board of School Directors*, 418 Pa. 520, 529, 211 A.2d 487 (1965).

■ While the General Assembly may, with adequate standards and guidelines, constitutionally delegate the power and authority to execute or administer a law, the prohibition against delegation of "legislative power" requires that the *basic policy choices* be made by the General Assembly. *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 212, 346 A.2d 269 (1975) (Opinion Announcing the Judgement of the Court); *Tosto v. Pennsylvania Nursing Home Loan Agency*, 460 Pa. 1, 11, 331 A.2d 198, 202 (1975).

The issue, therefore, is whether the one year extension of life (or "postponement of termination"), granted to the Commission through two resolutions by the Leadership Committee pursuant to section 4(4) of the Sunset Act, was an exercise of legislative power, or was it merely the execution or administration of a law. If the former, the extension is unconstitutional; if the latter, it is unconstitutional unless the delegation of such authority to the Leadership Committee was accompanied by adequate standards and guidelines for determining whether such an extension (or postponement) should be granted. We do not reach the

second question, for it is clear that the resolutions of the Leadership Committee extending the life of the Commission were, pure and simple, an unconstitutional exercise of the legislative power to make and enact laws.

It is hard to imagine a *more basic* policy question than whether or not a particular agency will exist; but for the affirmative action of six members of the General Assembly composing the Leadership Committee, the Commission would have been terminated as scheduled by the full Legislature on June 30, 1988 (following the six month "wind up" period of section 6(f)). The actions of six members of the General Assembly in effect *reestablished* an otherwise terminated agency that would have ceased to exist were it not for the two resolutions of the Leadership Committee under section 4(4). Unlike the *automatic* six month continuation of an agency's existence to wind up its affairs under section 6(f), the two six month extensions (or postponements) under section 4(4) required the exercise of discretion and affirmative steps by a small body of legislators identified by title.

There is no doubt that section 4(4) of the Sunset Act reposes the "legislative power" in its quintessential form— the power to make or repeal a law, to establish or terminate an agency—in a committee. The legislative power "shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." Art. II, § 1. There is no room in this explicit provision for the exercise of the legislative power by committee, whether that committee is composed of certain select members of the General Assembly, by a person or body within one of the other branches of government, or by a private person or organization. Section 4(4) does not, as the Commission suggests, merely delegate the power to administer a procedural mechanism of the Sunset Act; to the manifest contrary, section 4(4) quite literally delegates the power of life or death to six designated members of the General Assembly. Accordingly, section 4(4) of the Sunset Act is an unconstitutional

delegation of the legislative power under Article II, section 1.[3]

■ The resolutions of the Leadership Committee extending the life of the Commission until December 31, 1988 were therefore null and void and without legal effect. The scheduled termination date of December 31, 1987 remained operative, and the Commission ceased to legally exist as of June 30, 1988 following the automatic wind up period provided by section 6(f) of the Sunset Act. Although the Commission has now been constitutionally reestablished (presumptively) as of June 26, 1989, in the interim the Commission was a legal non-entity and any actions taken by the Commission during that period are also null and void. This would include the service of the subpoena for the records of the First Pennsylvania Bank, and, for that matter, the filing of the appeal in this Court.

Mindful that there is a strong and fundamental presumption that the legislature has acted properly and within constitutional bounds, and that legislation will not be deemed unconstitutional unless it clearly, plainly and palpably violates some specific mandate or prohibition of the constitution, *Commonwealth v. Parker White Metal Co.,* 512 Pa. 74, 82, 515 A.2d 1358 (1986), nevertheless we do not hesitate to declare section 4(4) of the Sunset Act an unconstitutional delegation of the legislative power. Accordingly, we grant appellees' application to quash this appeal.

Appellees' Application to Quash the Appeal is granted. Jurisdiction is relinquished.

PAPADAKOS, J., did not participate in the consideration or decision.

3. Because we find section 4(4) of the Sunset Act to be a clear violation of Article II, section 1, we need not and do not address the constitutionality of that section under the provisions of the Pennsylvania Constitution dealing with the legislative procedure by which laws are to be enacted, *e.g.,* Article III, sections 1–4, and with presentment to the Governor for approval, Article IV, § 15 and Article III, § 9. *See generally, Commonwealth v. Sessoms,* 516 Pa. 365, 532 A.2d 775 (1987) (constitutionality of sentencing guidelines promulgated by Pennsylvania Commission on Sentencing).