624 A.2d 742

**MACHIPONGO LAND AND COAL COMPANY, INC. and the Victor E. Erickson Trust and Joseph Naughton, Petitioners,**

**v.**

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, the Environmental Quality Board, and Arthur A. Davis, Secretary of Environmental Resources, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Dec. 15, 1992.

Decided April 15, 1993.

Reargument Denied May 14, 1993.

74

76

Andrew H. Cline and Joel R. Burcat, for petitioners.

Joseph G. Pizarchik, Asst. Counsel, for respondents.

Before DOYLE and PELLEGRINI, JJ., and SILVESTRI, Senior Judge.

PELLEGRINI, Judge.

Machipongo Land and Coal Company, Inc., the Victor E. Erickson Trust and Joseph Naughton (Coal Owners) filed a petition for review in our original jurisdiction,[1] seeking equitable and declaratory relief against the Commonwealth of Pennsylvania Department of Environmental Resources (DER), the Environmental Quality Board (EQB) and Arthur A. Davis, Secretary of Environmental Resources (collectively, the Commonwealth), challenging DER's designation as unsuitable for surface mining certain lands they own in the Goss Run Watershed. That designation was made pursuant to Section 4.5(b) of the Surface Mining Conservation and Reclamation Act (PaSMCRA), Act of May 31, 1945, P.L. 1198, *as amended,* 52 P.S. § 1396.4e(b).[2] Coal Owners' petition claims that

1. Section 761(a)(1) of the Judicial Code, 42 Pa.C.S. § 761(a)(1).

2. Section 4.5(b) provides that the department may designate an area as unsuitable for all or certain types of surface mining operations if such operation will:

 (1) be incompatible with existing state or local land use plans or programs;

PaSMCRA and regulations implementing it constitute a taking without just compensation, as well as a violation of their due process rights. The Commonwealth has filed preliminary objections to Coal Owners' petition, claiming that we are without jurisdiction to hear this case, as well as a demurrer to certain claims.

■ Section 4.5(f) of PaSMCRA provides that the designation process may be initiated by parties affected by potential surface mining by filing a petition with DER to designate an area as unsuitable for surface mining. In April of 1989, DER received a petition from the Brisbin Recreation Board and the Locust Grove Sportsmen Club to designate 2.86 square miles of the Goss Run Watershed as unsuitable for surface coal mining.[3] Their petition alleged that surface mining in the area proposed for designation would cause long term degradation of waters that would adversely affect a trout fishery, the aesthetic qualities of a high-use public park, the availability of emergency water supplies, wildlife habitat, important wetlands, and outdoor recreational uses. Coal Owners, owners of surface or mineral interests in the proposed designated area, were granted intervenor status.

> (2) affect fragile or historic lands in which such operations could result in significant damage to important historic, cultural, scientific and aesthetic values and natural systems;
> (3) affect renewable resources land in which such operations could result in substantial loss or reduction of long-range productivity or water supply or food or fiber products and such lands include aquifer recharge areas; or
> (4) affect natural hazard lands in which such operations could substantially endanger life and property, such lands to include areas subject to frequent flooding and areas of unstable geology.

3. The Pennsylvania Surface Mining Act was amended in 1980 to meet the requirements of the Federal Surface Mining Control and Reclamation Act (FSMCRA), 30 U.S.C. § 1201 et seq., which mandates that states regulating coal mining activities conform to minimum procedural and substantive requirements set forth in FSMCRA and in its regulations promulgated by the Department of Interior, Office of Surface Mining. *Arsenal Coal Company v. Department of Environmental Resources*, 505 Pa. 198, 477 A.2d 1333 (1984). State programs must meet the applicable federal minimums in order to maintain primary jurisdiction over the enforcement of the regulations. *Id.*, 505 Pa. at 202–203, 477 A.2d at 1336.

Public hearings were held on the petition, affording both those supporting and opposing the designation an opportunity to be heard, and DER conducted an environmental and economic impact study of the proposed area as required by Section 4.5(g) of PaSMCRA. In July of 1991, the EQB approved a proposed regulation designating the area unsuitable for surface mining of coal. The proposed regulation was submitted to the General Assembly and after a period of public comment, the final form of the regulation was published in the Pennsylvania Bulletin on May 23, 1992, at 25 Pa.Code § 86.130(b)(14).[4]

Coal Owners filed the instant petition for review, challenging the regulation implementing the designation of the Goss Run area by claiming that:

● the EQB's designation is invalid because it did not exist when it approved 25 Pa.Code § 86.130(b)(4) designating the property as unsuitable for mining;

● Section 4.5(e) of PaSMCRA is facially unconstitutional because it does not provide for just compensation to owners of coal in land designated as unsuitable for mining;

● the process by which lands are designated as unsuitable for mining is unconstitutional because it does not provide adequate due process to affected Coal Owners;

● even if the EQB's action was valid and Section 4.5 is unconstitutional, the procedures presently in existence were not followed and the designation of the Goss Run area should be declared invalid;

● even if there was no impediments to the designation, declare that the designation of the Goss Run area constituted a regulatory taking of their coal.

4. 25 Pa.Code § 86.130 provides in relevant part:
 (b) The following is a list of descriptions of areas which are unsuitable for surface coal mining and where no surface coal mining operations will be permitted:
 \* \* \* \* \* \*
 (14) The surface mineable coal reserves within the Goss Run Watershed upstream of the Brisbin Dam ...

As a result, Coal Owners are requesting this court to declare the designation invalid; enjoin the Commonwealth to implement or enforce the regulation designating the Goss Run area as unsuitable for mining; order the DER to adopt regulations that provide for procedural constitutional safeguards; and/or refer the case to the common pleas court for a determination of damages under the Eminent Domain Code.

DER filed preliminary objections [5] to the petition for review, demurring to Coal Owners' cause of action, as well as contending that this court lacks original jurisdiction over the takings issue because:

● Section 4.5 of PaSMCRA is not facially unconstitutional;

● the claim is not ripe because they have failed to exhaust their administrative remedies;

● even if they are not required to exhaust their administrative remedies or there are none, this court should not

5. Our original jurisdiction provides for a cause of action cognizable at common law in the nature of equity, replevin, mandamus, quo warranto, declaratory judgment or prohibition, and be commenced by filing a petition for review rather than a complaint. Accordingly, the petition for review, in our original jurisdiction, is a fact pleading document and detailed factual allegations will generally be required to describe adequately the challenged action. *See* Darlington, et al., Pennsylvania Appellate Practice §§ 1513:2; 1513:4; 1513:5 (1986). *See also McCain v. Curione,* 106 Pa. Commonwealth Ct. 552, 527 A.2d 591 (1987).

Unless otherwise proscribed in Chapter 15 of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 106 and 1517 incorporate the rules of civil procedure in matters brought before us within its original jurisdiction insofar as they may be applied. The pleader must define the issues, and every act or performance essential to that act must be set forth in the complaint. *See* Pa.R.C.P. No. 1019. *See also Getsie v. Borough of Braddock,* 126 Pa. Commonwealth Ct. 639, 560 A.2d 875 (1989), *appeal denied,* 525 Pa. 629, 578 A.2d 415 (1990). In determining the preliminary objections, all well-pleaded facts which are material and relevant are deemed to be true. *Erie County League of Women Voters v. Department of Environmental Resources, Bureau of State Parks,* 106 Pa. Commonwealth Ct. 369, 525 A.2d 1290 (1987). Pleadings which are stated in conclusionary terms or which are statements of law will be disregarded. *Giffin v. Chronister,* 151 Pa. Commonwealth Ct. 286, 616 A.2d 1070 (1992). Where the preliminary objection is in the nature of a demurrer, it will be sustained only where the alleged facts clearly fail to state a claim under any theory of law. *Snyder v. City of Philadelphia,* 129 Pa. Commonwealth Ct. 89, 564 A.2d 1036 (1989).

exercise jurisdiction over the subject matter of this action, either because this matter should be referred to the Environmental Hearing Board as having "primary jurisdiction" or that this court is without jurisdiction because the courts of common pleas have original jurisdiction in eminent domain proceedings;

• DER also demurred to the Coal Owners' claim that the EQB action designating Goss Run as unsuitable for mining was a nullity because it did not exist at that time.

## I.

■ Coal Owners contend that the EQB's designation of the Goss Run area, effective May 23, 1992, was invalid because the EQB was not in existence when it designated that area as unsuitable for mining. This contention is based on our Supreme Court's decision in *Blackwell v. Commonwealth, State Ethics Commission,* 523 Pa. 347, 567 A.2d 630 (1989) (*Blackwell II* ). In that decision, certain procedures that are provided for in the Sunset Act[6] that allowed the Leadership Committee[7] to extend the existence of agencies that were scheduled to go out of business under the Sunset Act's provisions were declared to be an unlawful delegation of legislative powers under Article II, Section 1 of the Pennsylvania Constitution.[8] Because it was an unlawful delegation, the Supreme Court held that agencies extended by those procedures became "legal non-entities" and "any actions taken by the agency during that period [were] . . . null and void." *Blackwell II,*

6. Act of December 22, 1981, P.L. 508, *as amended,* 71 P.S. §§ 1795.1–1795.14.

7. The Leadership Committee consists of the Speaker of the House of Representatives, the President pro tempore of the Senate, and the Majority and Minority Leaders of [both] the House of Representatives and the Senate. Act of December 22, 1981, P.L. 508, 71 P.S. § 1795.3.

8. Pa. Const. art. II, § 1 provides that:
 The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives.

523 Pa. at 362, 567 A.2d at 637.[9]

The EQB was scheduled to go out of existence on December 31, 1983. Its existence was extended by a provision of the type found to be unconstitutional in *Blackwell II*. Coal Owners represent that it has never been reauthorized by appropriate legislation, and accordingly, the Goss Run designation should be declared null and void.

The Commonwealth demurs to the claim that the designation was invalid. It does not dispute that the EQB was not properly reauthorized or that legislation has been enacted correcting that defect. First, it contends *Blackwell v. Commonwealth, State Ethics Commission*, 527 Pa. 172, 589 A.2d 1094 (1991) (*Blackwell V*), held that challenges based on *Blackwell II* are to be given effect only to cases pending when that decision was decided. *Id.* 527 Pa. at 188, 589 A.2d at 1102. Because most agencies that had gone out of existence had been validly established by subsequent legislation, *Blackwell V* limited challenges to actions of agencies that had been reestablished to those cases where the issue of improper delegation had been timely entered. By limiting *Blackwell II* in that manner, the Supreme Court sought to quell any uncertainty as to the effectiveness of action taken by agencies during the interregnum between the time they went out of existence and reestablishment.

 What *Blackwell V* did not do was validate actions of agencies that were not validly reestablished and continued to operate. Apparently, the EQB was never lawfully reestablished, and under *Blackwell V* alone, its actions continue to be invalid. Consequently, *Blackwell V* has no application to saving any of the 200 environmental regulatory proposals that have been published as proposed or found in the Pennsylvania Bulletin since July 1, 1984, including designation of areas such as Goss Run, as unsuitable for mining.[10]

9. For an extensive discussion of the *Blackwell* decisions, *see* Comment, *"Sublegislative Delegation:" Examining Its Constitutionality In Pennsylvania and The United States*, 1 Widener J. Pub.L. 207 (1992).

10. The Commonwealth also contends that *Blackwell II* does not apply because the EQB's actions in issuing regulations are quasi-legislative

Even if we find that *Blackwell V* does not apply, the Commonwealth urges us to adopt the holding in *West Shore School District v. Pennsylvania Labor Relations Board*, 131 Pa. Commonwealth Ct. 476, 570 A.2d 1354 (1990), *remanded sub. nom. Blackwell v. Commonwealth, State Ethics Commission*, 527 Pa. 172, 589 A.2d 1094 (1991) (*Blackwell V*) (No. 15 M.D.1990, argued September 24, 1992, awaiting opinion), a single judge opinion. In *West Shore*, an action of the Pennsylvania Labor Relations Board (PLRB) was challenged because it, like the EQB and three other agencies, had been extended pursuant to Section 4(4) of the Sunset Act and reauthorized through the Sunset Resolution process as provided for in subsection 7(b) of the Sunset Act, 71 P.S. § 1795.7(b). Finding that subsection 7(b) suffered the same conditional infirmities that *Blackwell II* found to be unconstitutional in Section 4(4), *West Shore* declared subsection 7(b) also to be unconstitutional. The court then went on to hold that because Section 4(4) and subsection 7(b) were not severable, the entire statute was unconstitutional. The court concluded that because the Sunset Act was unconstitutional, agencies such as the EQB never went out of existence.

We so hold in this case. We recognize that this matter will be resolved by the Supreme Court in *West Shore*, but because of the manner in which we ultimately resolve this matter, if the Supreme Court overrules *West Shore*, this matter can be raised again during this proceeding. Accordingly, we sustain the Commonwealth's demurrer to Coal Owners' claim that the EQB's designation of Goss Run as unsuitable for surface mining was invalid because the EQB was no longer legally in existence as a result of *Blackwell II*.

## II.

### A.

■ To understand the issues presented in this case, it is necessary to examine the history of PaSMCRA, particularly

and not adjudicative. We find no merit in that position, because if an agency is unable to issue adjudications because it does not exist, it is equally unable to issue regulations.

Section 4.5, and its implementing regulations that provide for the method for declaring an area unsuitable for surface mining. In 1977, Congress enacted the Federal Surface Mining Control and Reclamation Act (FedSMCRA), 30 U.S.C. §§ 1201–1328, setting forth a comprehensive and detailed set of requirements governing the surface mining of coal and other minerals. Finding that the surface mining of coal affects interstate commerce, and that uniformity of regulation is necessary, FedSMCRA effectively preempted surface mining regulation by the states. However, FedSMCRA provides the means for substantial regulatory cooperation between the states and the federal government. *National Wildlife Federation v. Hodel,* 839 F.2d 694, 766 (D.C.Cir.1988); *In re Permanent Surface Mining Regulation Litigation,* 653 F.2d 514 (D.C.Cir.1981).

Under the federal scheme, a state is permitted, after a period of direct federal regulation, to seek "primacy" (primary jurisdiction) by submitting a proposed regulatory scheme to the United States Secretary of the Interior (Secretary). The Secretary approves the state program if it is "in accordance with" the federal statute and "consistent with" the federal implementing regulations. 30 U.S.C. § 1253(a)(1), (3) and (7); 30 C.F.R. § 840.15, 43 C.F.R. §§ 4.1209–4.1238.

 To obtain primacy over surface mining in Pennsylvania, the Commonwealth conformed its statutes and regulations to the minimum standard set forth in the FedSMCRA and the federal implementing regulations.[11] On July 30, 1982, the Secretary approved the Commonwealth's plan to come into conformity and the state was given primacy over the enforcement of surface mining in Pennsylvania. As part of this process to obtain primacy, the state was required to establish

11. To illustrate the extent to which FedSMCRA and PaSMCRA are intertwined, this court in *Pennsylvania Coal Mining Association v. Commonwealth, Department of Environmental Resources,* 70 Pa. Commonwealth Ct. 489, 453 A.2d 694 (1982), *appeal denied as moot,* 498 Pa. 1, 444 A.2d 637 (1982), enjoined the Secretary of the DER from submitting to the federal government any regulatory program or applying for primary jurisdiction until judicial challenges to FedSMCRA in the federal courts were adjudicated.

a procedure to designate an area as unsuitable for mining. 30 U.S.C. § 1272. To comply with this provision, the General Assembly enacted Section 4.5 of PaSMCRA which provides a formal procedure for designating lands as unsuitable for mining. That process is regulatory as opposed to adjudicatory, and resembles at a local level what would be considered a request for rezoning of property.

When, as here, a private party is seeking designation, that party must file a petition with DER setting forth the area to be designated, the interest of the petitioner in seeking the designation, and the reason why the area is unsuitable for mining. 25 Pa.Code § 86.123. Once DER deems the petition to be complete, by statute it is allowed ten months to undertake a technical study of the proposed designation. *Id.* § 86.-124. During that time, the petition is akin to a pending zoning ordinance in that no mining permit may be issued while the study is underway.

Even though Section 4.5(h) provides that DER will hold the required hearings, DER, through regulations, delegated that responsibility to the EQB. Under the regulations, within that ten months after receipt of the complete petition and after giving appropriate notice, a public hearing must be held by the EQB in the locality of the area to be designated. *Id.* § 86.125. The EQB then has sixty days to make a final written decision based on the evidence gathered by the EQB, DER and other governmental agencies; the EQB must also consider testimony and evidence presented by the public. The EQB must issue its final decision by regulation. *Id.* § 85.126.

Because DER has chosen to designate areas as unsuitable for mining through an EQB "regulation" rather than as an "adjudication", the property owner is considered just another interested party potentially affected by the proposed designation. Further, because the designation is made by regulation, no one property owner has the right to challenge the designation in a full blown due process hearing with the right to cross-examination and judicial review.

Because Section 4.5 does not provide them with compensation for any coal that they will be unable to mine, Coal Owners contend the designation results in the taking of their coal without just compensation. Further, because they were not afforded a hearing where they could challenge the designation in an adjudicatory manner and a taking of their coal has occurred, Coal Owners contend that their due process rights were violated.

## B.

The Commonwealth demurs to that portion of Coal Owners' petition claiming that Section 4.5 of PaSMCRA is unconstitutional on its face because it does not specifically provide for compensation to coal owners when lands are designated as unsuitable for surface mining, relying on the Supreme Court's decision in *Hodel v. Virginia Surface Mining & Reclamation Assoc.*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). In *Hodel*, the provisions of the FedSMCRA prohibiting surface mining within certain distances of homes, parks and public buildings were challenged as unconstitutional because the FedSMCRA did not provide for compensation for coal within those designated areas. Rejecting that contention, the Supreme Court held that the "mere enactment" of FedSMCRA facially does not deprive landowners of all economically viable use of their property. *Id.*, 452 U.S. at 298, 101 S.Ct. at 2371–72. The basis for that holding was that only after examining the effects of the government action on the ability to use a specific piece of property can it be determined whether there has been a taking, requiring compensation under the Fifth Amendment to the United States Constitution. The Supreme Court stated:

By proceeding in this fashion, the court below ignored this Court's oft-repeated admonition that the constitutionality of statutes ought not to be decided except in an actual factual setting that makes such a decision necessary. Adherence to this rule is particularly important in cases raising allegations of an unconstitutional taking of private property. Just last Term, we reaffirmed that

> "this Court has generally 'been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.' Rather, it has examined the 'taking' question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action—that have particular significance." *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979).
>
> These "ad hoc, factual inquiries" must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances. (Citations omitted).

*Id.,* 452 U.S. at 294–295, 101 S.Ct. at 2370.

▪ Similarly, Section 4.5 cannot be declared as facially unconstitutional until it is determined how it affects specific property. While there is no doubt that PaSMCRA can operate to effect a regulatory take if the property owner is deprived of all use of its property, *see Whitney Benefits v. United States,* 926 F.2d 1169 (Fed.Cir.1991), whether that has occurred can only be determined after the development of a factual record of how the regulation deprives the owner of the property and to what degree. Because Section 4.5 is not facially unconstitutional, the Commonwealth's preliminary objection is sustained and that portion of Coal Owners' petition is dismissed.

## C.

The Commonwealth next contends that we should not address whether a taking has occurred, even as the regulation applies to this specific property, because it is not yet "ripe" for determination. It argues that whether a regulation has operated to take property can only be determined after Coal

Owners have availed themselves of what it contends are available administrative remedies that might lessen the impact of the designation of their coal rights. Until Coal Owners have availed themselves of their administrative remedies, the Commonwealth argues that this court would be unable to determine the impact and the scope of the take, if any, and accordingly, we should decline jurisdiction.

A claim is not considered "ripe" until all available administrative remedies have been pursued by the owner of the property affected by the regulation, because the administrative process might lead to an accommodation that would avoid the constitutional issue entirely. *Virginia Surface Mining*, 452 U.S. at 297, 101 S.Ct. at 2371; *Williamson Co. Regional Planning Comm. v. Hamilton Bank*, 473 U.S. 172, 191, 105 S.Ct. 3108, 3119, 87 L.Ed.2d 126 (1985); *Gardner v. Department of Environmental Resources*, 145 Pa. Commonwealth Ct. 345, 603 A.2d 279 (1992). For this reason, the taking issue is simply not ripe for judicial resolution until the administrative process is completed. *Id.; Williamson Co.*, 473 U.S. at 190–191, 105 S.Ct. at 3118–19.

Of course, a claim is only not ripe when there is an adequate administrative remedy that the property owner can pursue to obtain adequate administrative relief. For there to be adequate administrative relief, there must facially exist a tenable claim that can be made under a reasonable interpretation of statutes and regulations involved. *Gardner*, 145 Pa. Commonwealth Ct. at 352–353, 603 A.2d at 283. There are three administrative claims that the Commonwealth suggests Coal Owners could pursue that may result in permitting them to mine coal on their land.

First, the Commonwealth suggests that Coal Owners could seek a permit under Section 4.5(e) of PaSMCRA[12] which

12. Section 4.5(e) provides:
 The requirements of this section shall not apply to lands on which surface mining operations were being conducted on August 3, 1977, or are being conducted under a permit issued pursuant to this act, or where substantial legal and financial commitments as they are defined under § 522 of the Surface Mining Control and Reclamation

authorizes the Department to issue a surface mining permit for an area within an area designated as unsuitable for surface mining, where the applicant has established to its satisfaction that it has made substantial legal and financial commitments to surface mine the coal. DER, however, admits that the EQB could have exempted Coal Owners from this surface mining prohibition when it made the designation if it found any evidence of such commitments, but it did not. Additionally, nothing in the pleadings suggest any facts that Coal Owners have made a financial or legal commitment that would justify the grant of a permit under Section 4.5(e) of PaSMC-RA. Absent any facts in the complaint that plead such a commitment, relief on that basis is not available.

The Commonwealth also suggests that Coal Owners should have sought to have the just designated Goss Run area designation terminated pursuant to Section 4.5(f) [13] of PaSMC-RA. The EQB recently made the designation of the Goss Run area and the Coal Owners opposed it. Absent a showing that there has been a substantial change in the considerations that led up to the designation, it is a bit disingenuous for the Commonwealth to suggest that Coal Owners must go back to the EQB to have the property immediately redesignated when that agency just designated the property as unsuitable for surface mining. That is not even remotely an adequate administrative remedy.

Finally, the Commonwealth suggests that the property owner could seek to extract coal by applying for a permit to deep mine the coal.[14] It makes this suggestion even though it concedes surface structures, such as tipples and collieries

Act of 1977, 30 U.S.C. § 1201 et seq. if such operations were in existence prior to January 4, 1977.

13. Section 4.5(f) provides:

Any person having an interest which is or may be adversely affected shall have the right to petition the department to have an area designated as unsuitable for surface mining operations, or to have such a *designation terminated.* (Emphasis added.)

14. Section 5 of the Bituminous Mine Subsidence and Land Conservation Act, 52 P.S. § 1406.5; Section 315 of the Clean Streams Law, 35 P.S. § 691.315.

necessary to deep mine, are not permitted in areas designated as unsuitable for surface mining. 25 Pa.Code §§ 86.101, 86.-121. Coal Owners' amended complaint alleges that because the surface structures cannot be placed in the Goss Run designated area, the coal cannot be effectively deep mined. Again, because there is nothing alleged in the complaint that would in any way establish that this is a tenable claim, adequate administrative relief is not available.

## III.

Remaining challenges to the designation contained in Coal Owners' petition are that the designation of the Goss Run area as unsuitable for mining is an unconstitutional taking of their property; that the implementing regulation does not provide for adequate due process; and that even those tainted procedures were not followed in a designated process. The Commonwealth contends that we should not assume jurisdiction over those claims or even refer the taking issue to the common pleas court to determine whether a *de facto* taking has occurred under the Eminent Domain Code. Rather, it asserts that it would be more appropriate to refer this matter to the Environmental Hearing Board (EHB) for resolution under the doctrine of "primary jurisdiction."

[20–22] "Primary jurisdiction" is a judicially created doctrine that permits courts to make a workable allocation of business between themselves and agencies responsible for the regulation of certain industries. *C.A.B. v. Modern Air Transp.*, 179 F.2d 622, 625 (2d Cir.1950). It arises in situations where the original jurisdiction of the court is being invoked to decide the merits of the controversy: the facts, the law and the relief. Rather than exercising its own jurisdiction to entertain the action to decide one of the relevant issues or to entertain the action at all, the court declined jurisdiction because it is proper to defer to administrative agency jurisdiction. Primary jurisdiction is exclusive jurisdiction insofar as the agency has jurisdiction over the cause of action to which a decision of the court is relevant; for example, where the

doctrine of collateral estoppel operates. The jurisdiction of the court will extend to the remaining issues and the relief to be granted. Jaffe, *Primary Jurisdiction*, 77 Harv.L.Rev. 1037 (1964).[15]

While originally a federal doctrine established by the United States Supreme Court in *Texas & Pac. Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 441, 27 S.Ct. 350, 355, 51 L.Ed. 553 (1907), our Supreme Court adopted this doctrine in *Weston v. Reading Co.*, 445 Pa. 182, 282 A.2d 714 (1977). As explained in *Elkin v. Bell Telephone of Pa.*, 491 Pa. 123, 132–133, 420 A.2d 371, 376 (1980):

> The principles of the doctrine of primary jurisdiction are well settled. The United States Supreme Court "... recognized early in the development of administrative agencies that coordination between traditional judicial machinery and these agencies was necessary if consistent and coherent policy were to emerge. The doctrine of primary jurisdiction has become one of the key judicial switches through which this current has passed." The doctrine " ... requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." (Citations omitted.)

> As to its effect, our Supreme Court then went on to state: It is equally important to realize what the doctrine is not—it is not simply a polite gesture of deference to the agency seeking an advisory opinion wherein the court is free to ignore the agency's determination. Rather, once the court properly refers a matter or a specific issue to the agency, that agency's determination is binding upon the court and the parties (subject, of course, to appellate review through normal channels), and is not subject to collateral attack in the pending court proceeding. "The common law doctrine of res judicata, including the subsidiary doctrine of collateral estoppel, is designed to prevent the relitigation by the same parties of the same claim or issues." K.C. Davis, Administrative Law, § 18.10 (1972). Once the administra-

---

**15.** This article was cited extensively by our Supreme Court in *Elkin v. Bell Telephone of Pa.*, 491 Pa. 123, 420 A.2d 371 (1980).

tive tribunal has determined the issues within its jurisdiction, then the temporarily suspended civil litigation may continue, guided in scope and direction by the nature and outcome of the agency determination. *Feingold v. Bell of Pennsylvania*, supra [477 Pa. 1] at 22, 383 A.2d [791] at 801 [ (1977) ] (Pomeroy, J., dissenting).

From *Elkin*, other cases, and sources upon which that decision relied, it appears that a matter is referred to an administrative agency under the doctrine of primary jurisdiction. When primary jurisdiction is conferred on an administrative agency, most, if not all, of the following elements are present:

- the industry is a heavily regulated industry;

- to resolve the matter at issue requires a special expertise that resides within the agency; [16]

- the issue is fact specific and ordinarily requires voluminous and conflicting testimony to resolve it;

- the administrative agency was created to address and focus on problems similar to the one for which its primary jurisdiction is being advanced;

- it has jurisdiction to issue the relief requested; [17]

- and, overriding all other factors, the regulatory system will work better if the administrative agency hears the matter rather than the courts.

The facts presented in this case have all of the elements that would justify referring this matter to the EHB under the doctrine of primary jurisdiction:

**16.** In *Elkin*, there was a dispute as to whether a matter had to be "complex" to invoke this doctrine. Both Justice Eagen and Justice Roberts found that the dispute need not be a complex one, and Justice Eagen stated that he read the majority opinion not to require complexity as a pre-requisite to referral. *Elkin*, 491 Pa. at 135, 420 A.2d at 378.

**17.** Apparently, jurisdiction is not a pre-requisite for referral to an administrative agency. Justice Nix, in his dissent in *Elkin*, objected to the majority so holding. He based his dissent on the principal that "it is black letter law that a statutorily created agency or commission possesses only the jurisdiction conferred upon it by the creating legislative body." *Elkin*, 491 Pa. at 139, 420 A.2d at 380.

• surface mining is a highly regulated industry. Mine operators are required to obtain mining licenses which apply to all their mining operations. 52 P.S. § 1396.3(a)(a), and each mine site is required to be mined pursuant to a mining permit issued by DER. 52 P.S. § 1396.4(a). Prior to mining any permitted site, a licensed mine owner must submit a bond to DER to insure that the operator will reclaim the area after mining. 52 P.S. §§ 1396.4(d)—1396.-4(j). During operation of the mine, a mine operator is required to comply with various performance standards. *See e.g.* 25 Pa. Code § 87.91–181. DER routinely inspects all surface mines and may impose civil or criminal penalties for violations of any of the provisions of PaSMCRA, regulations or permits. 52 P.S. §§ 30.63, 1396.21, 1406.13. *See also* 35 P.S. § 691.601(c).

• the decision to designate an area for mining involves scientific and technical expertise that are best suited for the department;

• whether the designation is proper and whether it constitutes a regulatory take of the coal rights needs to be determined in the specific factual setting of Goss Run and will require lengthy testimony to resolve;

• the regulatory system will work better if the matter is referred to the EHB; not only is it the "normal" way such matters are normally resolved, it appears to be the scheme that the General Assembly envisioned in Section 4.5(h) when it vested in DER the duty to hold hearings and designate lands as unsuitable for mining. Rather than holding the hearings as envisioned by the statute, DER promulgated regulations delegating that responsibility to the EQB. If DER would have held the hearings rather than the EQB, Coal Owners would have had a direct appeal to the EHB as a matter of right under the provisions of 35 P.S. § 7514(a).[18] Consequently, by giving primary jurisdiction to resolve this

18. 35 P.S. § 7514(a) provides:
The Board has the power and duty to hold hearings and issue adjudications ... on orders ... or decisions of the [DER].

matter to the EHB would allow the system to both work better and as planned;

• the EHB has ancillary jurisdiction to rule on the validity of regulations,[19] *Arsenal Coal Company v. Department of Environmental Resources*, 505 Pa. 198, 477 A.2d 1333 (1984); *Globe Disposal, Inc. v. Department of Environmental Resources*, 105 Pa. Commonwealth Ct. 599, 525 A.2d 437 (1984), and has heard cases involving whether a regulation results in a taking. *Mock v. Department of Environmental Resources*, No. 1153 C.D.1992 [— Pa. Commonwealth Ct. —, 623 A.2d 940] (filed March 25, 1993),[20] and whether the present regulations have been followed in designating their property.

Cognizant of our Supreme Court's warning in *Elkin* that "courts should not be too hasty in referring a matter to an agency or to develop a 'dependence' on the agencies whenever a controversy remotely involves some issue talking arguably within the domain of the agency's 'expertise'", we believe referral to the EHB is proper. All of the elements that indicate that the court can properly refer the EHB are present to invoke that doctrine. Consequently, we sustain the Commonwealth's preliminary objections that primary jurisdiction lies with the EHB.

An appropriate order will be entered.

## ORDER

AND NOW, this 15th day of April, 1993, it is ordered that:

19. A challenge generally to the constitutionality of a regulation can be brought before this court if it is not dependent on how it applies in a specific factual context, but its validity can be determined solely on the language of the regulation itself. *National Solid Waste v. Casey*, 135 Pa. Commonwealth Ct. 134, 142, 580 A.2d 893, 897 (1990).

20. While there have been a number of cases such as *Mock* that have reviewed the EHB's authority to consider whether a regulatory taking has occurred, that issue has never been squarely addressed. *See, e.g., Reilly v. Commonwealth, Department of Environmental Services*, 37 Pa. Commonwealth Ct. 608, 391 A.2d 56 (1978); *Merlin v. Commonwealth*, 72 Pa. Commonwealth Ct. 45, 455 A.2d 789 (1983).

1. the Respondent's demurrer to the claims that Section 4.5(f) is facially invalid and that the EQB was not in existence at the time of the designation of the Goss Run area is sustained;

2. the Commonwealth's preliminary objections that subject matter jurisdiction over the remaining claims is properly before the EHB are sustained;

3. this Petition is transferred to the EHB for adjudication.