**COMMONWEALTH of Pennsylvania,
by D. Michael FISHER, Attorney
General, Plaintiff**

v.

**JASH INTERNATIONAL,
INC., Defendant.**

Commonwealth Court of Pennsylvania.

Argued Dec. 8, 2003.

Decided Feb. 27, 2004.

Timothy P. Keating, Harrisburg, for plaintiff.

Michael R. Kelley, Harrisburg, for defendant.

BEFORE: COLINS, President Judge, and LEAVITT, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge LEAVITT.

The Attorney General of the Commonwealth of Pennsylvania (Commonwealth) has filed a complaint in this Court's original jurisdiction against Jash International, Inc. (Jash) for failing to satisfy its obligations under the Tobacco Settlement Agreement Act (TSAA).[1] In defense, Jash has asserted that the TSAA applies to cigarette manufacturers and Jash is an importer of cigarettes, not a manufacturer. Herein, we consider Jash's motion for summary judgment in its favor as well as its request for sanctions against the Commonwealth for filing a "baseless action."

This case has its origins in litigation initiated by numerous states, including Pennsylvania, against the leading tobacco product manufacturers in the United States[2] to recover their costs in treating victims of tobacco-related diseases. On

---

1. Act of June 22, 2000, P.L. 394, 35 P.S. §§ 5671–5675.

2. The five major tobacco manufacturers named in this litigation were Philip Morris USA Inc., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Corp, Lorillard Tobac-

co Co., and Liggett Group. In 1997, these companies, referred to as the "Original Participating Manufacturers" (OPMs), settled the litigation. The settlement permitted other tobacco companies to participate in the agreement. Thirty-six additional tobacco compa-

November 23, 1998, this litigation concluded in a settlement, the terms of which are set forth in the "Master Settlement Agreement" (Agreement).[3] The Agreement obligates manufacturers to specific undertakings, principally the payment of substantial sums over 25 years, in return for the states' release of past, present and future claims against those manufacturers for the costs of tobacco-related injuries and deaths.[4] In addition, the states agreed to enact "Qualifying Statutes" to require tobacco manufacturers that did not participate in the Agreement, "Non–Participating Manufacturers" (NPMs), to establish escrow funds[5] to provide a source of compensation for future claims and to eliminate any competitive advantage to be derived from a manufacturer's refusal to join the settlement. The escrow funds will be released to the NPMs in 25 years, so long as judgment is not entered against them in a healthcare cost recovery suit. The Commonwealth's qualifying statute is the TSAA.[6]

Jash sells cigarettes in Pennsylvania and in other states under the "Double Diamond" brand. These cigarettes are produced and packaged in India by GTC[7] Industries Limited (GTC), a corporation unrelated to Jash. Jash does not contribute any funds to a qualified escrow account. Because Jash contracted with GTC for the production of Double Diamond cigarettes, the Commonwealth believes that Jash is a NPM with obligations under the TSAA.

nies, known as "Subsequent Participating Manufacturers" (SPMs), have also settled.

3. In 1997, settlement had been reached with four states; in 1998, the settlement was extended to include the remaining 46 states, Puerto Rico and four territories.

4. Under the terms of the Agreement the OPMs and SPMs will pay the states $206 billion over the first 25 years of the agreement, and they will limit their advertising with the intention of reducing the number of young people who will start smoking.

5. The amount of the escrow funding is determined by the NPMs sales volume measured by the number of cigarettes on which state excise taxes are paid in each state. The qualifying statutes forbid NPMs from selling cigarettes in any state in which they failed to contribute to the escrow account. Participating manufacturers were concerned that they faced a significant price increase to pay the costs of the settlement, and could encounter a loss of market share due to the increased prices and the advertising/marketing restrictions.

6. Sections 5 and 6 of the TSAA provides in relevant part as follows:

(5) On November 23, 1998, leading United States tobacco product manufacturers entered into a settlement agreement, entitled the "Master Settlement Agreement," with the Commonwealth. The Master Settlement Agreement obligates these manufacturers, in return for a release of past, present and certain future claims against those manufacturers as described therein, to:

(i) Pay substantial sums to the Commonwealth, tied in part to those manufacturers' volume of sales.

(ii) Fund a national foundation devoted to the interests of public health.

(iii) Make substantial changes in the manufacturers' advertising and marketing practices and corporate culture with the intention of reducing underage smoking.

(6) It would be contrary to the policy of the Commonwealth if tobacco product manufacturers who decide not to enter into the Master Settlement Agreement or similar settlement were able to use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the Commonwealth will have a source of recovery from these manufacturers if they are found to have acted culpably. It is thus in the interest of the Commonwealth to require that these manufacturers establish a reserve fund to guarantee a source of compensation and to prevent these manufacturers from deriving large, short-term profits and then becoming judgment proof before liability may arise. 35 P.S. § 5672(5) and (6).

7. "GTC" stands for Global Tobacco Company.

When it was unsuccessful in persuading Jash of this position, the Commonwealth initiated this enforcement action. Jash seeks judgment in its favor on two grounds. First, Jash asserts the Commonwealth did not file a timely response to its motion for summary judgment, and this failure alone provides a basis for entering judgment in Jash's favor. Second, Jash asserts that it is not a cigarette manufacturer as defined in the TSAA and, therefore, has no obligation to escrow funds. Further, Jash seeks sanctions because Jash provided the Commonwealth with ample documentation of Jash's claim that it is an importer, not a manufacturer, and, thus, the Commonwealth has acted in bad faith.[8]

8. Jash notes that it provided the Commonwealth with a wealth of information and supporting documentation on a voluntary basis even before the Commonwealth filed its action.

9. It provides:
 **Rule 1035.3. Response. Judgment for Failure to Respond**
 * * *
 (a) ... [T]he adverse party may not rest upon the mere allegations or denials of the pleadings but must file a response within thirty days after service of the motion identifying
 (1) one or more issues of fact arising from evidence in the record controverting the evidence cited in support of the motion or from a challenge to the credibility of one or more witnesses testifying in support of the motion, or
 (2) evidence in the record establishing the facts essential to the cause of action or defense which the motion cites as not having been produced.
 (b) An adverse party may supplement the record or set forth the reasons why the party cannot present evidence essential to justify opposition to the motion and any action proposed to be taken by the party to present such evidence.
 * * *
 (d) Summary judgment may be entered against a party who does not respond.
 Pa. R.C.P. No. 1035.3.

We consider first the timeliness of the Commonwealth's response to Jash's motion for summary judgment. Jash's motion was filed on May 19, 2003, and the response was filed on June 20, 2003. Pa. R.C.P. No. 1035.3 [9] provides that a response to a summary judgment motion must be filed in thirty days. The Commonwealth maintains, however, that its response was timely under Pa. R.A.P. 121(c) [10] because Jash served its motion by first-class mail, thereby giving the Commonwealth three additional days to respond. We disagree that Pa. R.A.P. 121(c) applies in this circumstance.

Matters brought before this Court in its original jurisdiction proceed in accor-

Rule 3714(b) of the Pennsylvania Rules of Appellate Procedure provides for a briefing and argument schedule on motions for summary judgment in original jurisdiction matters before an appellate court. *See* Pa. R.A.P. 3714(b) and Note. The Court did issue a briefing schedule and an argument date in accordance with Rule 3714(b). There is nothing in either Rule 3714(b) or any other appellate rule, however, which supplants the requirement of Pa. R.C.P. No. 1035.3 that a nonmovant must respond to a motion for summary judgment within thirty days after service of the motion. *Accord Stilp v. Hafer,* 701 A.2d 1387, 1390 (Pa.Cmwlth.1997), *affirmed,* 553 Pa. 128, 718 A.2d 290 (1998) (applying Rule 1035.3 to a summary judgment motion filed in the Commonwealth Court); Pa. R.A.P. 1542, Note (observing applicability of Pennsylvania Rules of Civil Procedure to summary judgment motions in original jurisdiction cases, pursuant to Pa. R.A.P. 106).

10. It provides:
 **(c) Manner of service.** Service may be personal or by first class mail. Personal service under these rules includes delivery of the copy to a clerk or other responsible person at the office of the person served. Service by mail is complete on mailing. Pa. R.A.P. 121(c).

dance with the practice and procedure in the courts of common pleas. Pa. R.A.P. 106 and 1517. As we have explained,

> [u]nless otherwise proscribed in Chapter 15 of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 106 and 1517 incorporate the rules of civil procedure in matters brought before us within its original jurisdiction insofar as they may be applied.

*Machipongo Land and Coal Co., Inc. v. Department of Environmental Resources,* 155 Pa.Cmwlth. 72, 624 A.2d 742, 746 n. 5 (1993). Because the Pennsylvania Rules of Civil Procedure provide adequate guidance on the filing of responses to motions for summary judgment filed in this Court's original jurisdiction, it is unnecessary to resort to the Pennsylvania Rules of Appellate Procedure. Pa. R.A.P. 121(c)[11] cannot be invoked to extend the response deadline of June 18, 2003 prescribed by Pa. R.C.P. No. 1035.3.

▮▮▮▮ As noted by Jash, in the absence of a timely response to a motion for summary judgment, a court may enter judgment in favor of the moving party. Pa. R.C.P. No. 1035.3(d). However, the court is not required to grant judgment in such circumstances. *Stilp v. Hafer,* 701 A.2d 1387, 1390 (Pa.Cmwlth.1997). It is within the discretion of the court, *sua sponte,* to allow the non-moving party to respond to a

motion for summary judgment after the thirty-day period has elapsed. *Thomas v. Elash,* 781 A.2d 170, 177 (Pa.Super.2001). This was done in this case,[12] and we consider the Commonwealth's response in reviewing the merits of Jash's motion for summary judgment. Accordingly, Jash's first basis for granting summary judgment lacks a foundation.[13]

Next, we consider Jash's contention that it is not subject to the provisions of the TSAA. This question turns entirely upon whether Jash meets the statutory definition of a manufacturer. Section 3 of the TSAA defines "Tobacco product manufacturer" as follows:

> (1) *A person that* after the date of enactment of this act *directly* and not exclusively through any affiliate:

> (i) *manufactures cigarettes anywhere that such manufacturer intends to be sold in the United States, including cigarettes intended to be sold in the United States through an importer* (except where the importer is an original participating manufacturer, as that term is defined in the Master Settlement Agreement, that will be responsible for the payments under the Master Settlement Agreement with respect to the cigarettes as a result of the provisions of subsection II(mm) of the Master Settlement

---

**11.** It is clear that Pa. R.A.P. 121(c) applies to appellate papers and not to the detailed response required where a motion for summary judgment is filed.

**12.** On June 30, 2003, the Commonwealth requested a continuance for filing its brief in order to conduct discovery it needed to supplement the record. This Court granted the Commonwealth's request on July 3, 2003.

**13.** Summary judgment is properly granted where "the pleadings, depositions, answers to interrogatories, and admission[s] on file, together with the affidavits, if any, show that

there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Ducjai v. Dennis,* 540 Pa. 103, 107, 656 A.2d 102, 113 (1995). "The record must be viewed in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Marks v. Tasman,* 527 Pa. 132, 135, 589 A.2d 205, 206 (1991). Summary judgment may be entered only in those cases where the right is clear and free from doubt. *Musser v. Vilsmeier Auction Co., Inc.,* 522 Pa. 367, 369, 562 A.2d 279, 280 (1989).

Agreement and that pays the taxes specified in subsection II(z) of the Master Settlement Agreement and provided that the manufacturer of the cigarettes does not market or advertise the cigarettes in the United States);

(ii) is the *first purchaser anywhere for resale in the United States of cigarettes manufactured anywhere* that the manufacturer does not intend to be sold in the United States; or

(iii) becomes a successor of a person described in subparagraph (i) or (ii).

35 P.S. § 5673 (emphasis added). The Commonwealth asserts that Jash is a manufacturer because Jash had the intention to sell Double Diamond cigarettes in the United States and caused their production in India. Jash asserts that GTC is the manufacturer because it produced the cigarettes with the intention of selling them in this country through an importer, *i.e.,* Jash.

■ The material and relevant facts in this case are not in dispute. All of the documentation identifies GTC as the manufacturer [14] that intended to sell its product in the United States through Jash. These documents include: the contract between GTC and Jash; a representative invoice showing the United States as the country of final destination of the cigarettes sold by GTC to Jash; a representative bill of lading showing that the cigarettes were shipped by GTC to Jash in the United States; and a letter from GTC to Jash, noting that "[GTC] *as manufacturers* [sic] have to cover our costs, as per the Agreement." Supplemental Jash Brief, Exhibit C at 23. Other evidence shows that both GTC and Jash took the initiative

in getting the Double Diamond cigarettes to market. Correspondence from GTC to Jash notes that GTC will be responsible for packaging the Double Diamond cigarettes with the warning required by the United States Surgeon General; however, other documents show that Jash took responsibility for obtaining Federal Trade Commission approval of the Double Diamond health warning plan. The Double Diamond brand is a trademark registered and owned by Jash. Jash contacted several tobacco manufacturers in India, Sri Lanka and Pakistan, and GTC sought to win Jash's order by sending Jash free samples of its cigarettes.[15]

Jash contends that this evidence leads to one conclusion: GTC, not Jash, was the manufacturer. Indeed, it argues that the record contains no evidence that Jash was the manufacturer of Double Diamond cigarettes. The Commonwealth interprets this evidence differently. It believes that it shows that because Jash caused GTC's production of Double Diamond cigarettes in accordance with specifications designed by Jash, Jash is a manufacturer. It contends that the purpose of the TSAA is to hold those responsible for producing cigarettes for the United States market also responsible for the harm caused by those products. Further, it argues that this Court should defer to the Commonwealth's interpretation of the TSAA.

We do not accept the Commonwealth's logic that the party that requests the manufacture of a product is itself a manufacturer. US Airways contracts with Airbus for the production of A330 airplanes and requires that these airplanes meet certain specifications, including the use of U.S.

14. Notably, GTC's business stationery identifies its business as "Manufacturers of Quality Cigarettes."

15. Contract negotiations were conducted between Jash and GTC's export manager. This indirectly supports Jash's claim that it was the importer in the transaction.

Airways' copyrighted symbols and colors on the interior and exterior of the planes. Indeed, it is not likely that Airbus would undertake the manufacture of an A330 without a contract from an airline. Under the Commonwealth's theory, these operative facts would make U.S. Airways a manufacturer, and plainly it is not. The manufacture of a product according to customer specification is a commonplace occurrence, and the Commonwealth's theory is simply inconsistent with this commercial reality.

Further, the Commonwealth's argument ignores the plain language of the TSAA. Under the statute, a "tobacco product manufacturer" is defined as one who "directly" produces cigarettes specifically for sale in the United States "through an importer." 35 P.S. § 5673. Here, GTC directly produced the cigarettes for distribution through Jash. The only "constructive" manufacturer recognized in the TSAA is the "first purchaser," which is a person that buys cigarettes abroad that were intended by the manufacturer for distribution abroad. *Id.* Double Diamond cigarettes were intended for the United States; thus, Jash is not a first purchaser.

Had the Legislature intended the TSAA to cover all parties who are involved in the production and sale of tobacco products in the United States, including importers, vendors, warehousemen and transporters, it could have written the statute that way. However, the Legislature's declaration of policy in Section 2 of the TSAA, 35 P.S. § 5672,[16] consistently and exclusively re-

---

16. *It states:*

The General Assembly finds and declares as follows:

(1) Cigarette smoking presents serious public health concerns to the Commonwealth and to the citizens of this Commonwealth. The Surgeon General has determined that smoking causes lung cancer, heart disease and other serious diseases and that there are hundreds of thousands of tobacco-related deaths in the United States each year. These diseases most often do not appear until many years after the person in question begins smoking.

(2) Cigarette smoking also presents serious financial concerns for the Commonwealth. Under certain health care programs, the Commonwealth may provide medical assistance to eligible persons for health conditions associated with cigarette smoking, and those persons may be eligible to receive such medical assistance.

(3) Under the health care programs described in paragraph (2), the Commonwealth pays millions of dollars each year to provide medical assistance for these persons for health conditions associated with cigarette smoking.

(4) Financial burdens imposed on the Commonwealth by cigarette smoking should be borne by tobacco product manufacturers rather than by the Commonwealth to the extent that such manufacturers either determine to enter into a settlement with the Commonwealth or are found culpable by the courts.

(5) On November 23, 1998, leading United States tobacco product manufacturers entered into a settlement agreement, entitled the "Master Settlement Agreement," with the Commonwealth. The Master Settlement Agreement obligates these manufacturers, in return for a release of past, present and certain future claims against those manufacturers as described therein, to:

(i) Pay substantial sums to the Commonwealth, tied in part to those manufacturers' volume of sales.

(ii) Fund a national foundation devoted to the interests of public health.

(iii) Make substantial changes in the manufacturers' advertising and marketing practices and corporate culture with the intention of reducing underage smoking.

(6) It would be contrary to the policy of the Commonwealth if tobacco product manufacturers who decide not to enter into the Master Settlement Agreement or similar settlement were able to use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the Commonwealth will have a source of recovery from these manufacturers if they are found to have acted culpably. It is thus in the interest of the Commonwealth to require that these

fers to "manufacturers" and, as noted, the TSAA specifically excludes importers of cigarettes manufactured for sale in the United States from the definition of "tobacco product manufacturer." [17] 35 P.S. § 5673. This is a bright line distinction that cannot be set aside.

We do not agree that this Court must give deference to the Commonwealth's interpretation of the TSAA. Only where the language of a statute is ambiguous should we defer to an administrative agency's interpretation of a statute the agency is charged to enforce.[18] When the language of a statute is plain and conveys a clear and definite meaning, there is no occasion for resorting to rules of statutory interpretation and construction. *Davis v. Sulcowe*, 416 Pa. 138, 143, 205 A.2d 89, 91 (1964).[19] The TSAA is precise in its definitions and not ambiguous.

At the core of the Commonwealth's interpretation of the definition of "tobacco product manufacturer" is an apparent dissatisfaction with the legislative limitation of responsibility under the TSAA to those parties who actually *manufacture* the tobacco product, and the specific exclusion of those parties who *import* tobacco products under contracts which, admittedly, motivate foreign manufacturers to produce cigarettes for sale in the United States. The Commonwealth complains that it will be more difficult to enforce the TSAA if it is unable to hold Jash and other importers responsible, and this will be especially true where an importer contracts with numerous manufacturers.[20] We accept that it will be more difficult to enforce the TSAA against manufacturers located outside the United States. Further, the Commonwealth makes a good point that it is sound public policy to impose responsibility upon all persons that distribute cigarettes, which are harmful products, in the marketplace. However, this Court cannot rework the statute to improve its enforceability or to reflect our vision of sound public policy.

The Legislature chose to exempt the importer from the ambit of the TSAA. This Court must abide by the statutory

---

manufacturers establish a reserve fund to guarantee a source of compensation and to prevent these manufacturers from deriving large, short-term profits and then becoming judgment proof before liability may arise. 35 P.S. § 5672.

**17.** An importer who is "an original participating manufacturer" as defined in the TSAA, as a party to the Master Agreement, is the only importer included as a manufacturer and subject to the TSAA. The Commonwealth admits that Jash is not a party to the Master Agreement.

**18.** The Statutory Construction Act provides:

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

\* \* \*

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921(c)(8).

**19.** The principle of giving weight to administrative interpretation and practice under a statute is applicable only where ambiguous statutory language calls for a choice of one out of two or more possible constructions. An agency's interpretation is not persuasive, much less controlling, where the statute is *clear and explicit* in its language. *Federal Deposit Insurance Corp. v. Board of Finance and Revenue*, 368 Pa. 463, 84 A.2d 495 (1951). When the words of the statute are clear and free from all ambiguity, the letter of the statute is not to be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b). The meaning of the statute ultimately is a question of law for the reviewing court. *Philadelphia Suburban Corp. v. Board of Finance and Revenue*, 535 Pa. 298, 635 A.2d 116 (1993).

**20.** However, the converse is equally possible. Enforcement against a single foreign manufacturer who produces cigarettes for multiple importers simplifies enforcement by reducing the multiplicity of suits against importers.

definition of "tobacco product *manufacturer*" and the plain intent of the statute to exempt importers of cigarettes from enforcement under the statute. Accordingly, we hold that Jash is an importer of cigarettes, not a manufacturer, and, as such, has no obligations under the TSAA.

 The final issue before this Court is Jash's request for sanctions against the Commonwealth. Pa. R.C.P. No. 1023.1(d) provides for an award of attorneys fees and expenses to a party where an opposing party has commenced and pursued an action without legal or evidentiary support or for an improper purpose. The Court has significant discretion in determining whether to impose sanctions. *Id.*, Note. Here, we consider a case of first impression. Sanctions should be granted sparingly lest they have a chilling effect on the right of all parties, even the government, to litigate a controversy to conclusion. Accordingly, we decline to grant Jash's request for sanctions.

For these reasons, we grant summary judgment to Jash, but we refuse Jash's request for sanctions.

### ORDER

AND NOW, this 27th day of February, 2004 the Motion for Summary Judgment filed by Jash International, Inc. is GRANTED and its request for sanctions is DENIED.