## Dean v. Dean

*Konrad B. Jarzyna*, for plaintiff.
*Lawrence Sager*, for defendant.

LASH, *J.*, January 15, 2014—Plaintiff/appellant, Thomas A. Dean (hereinafter "Ex-Husband"), has filed an appeal from this court's decision entered October 24, 2013, denying Ex-Husband's exceptions to the report of the special master in divorce, and denying Ex-Husband's motion for sanctions.

The parties were married on May 30, 1986, being the third marriage for each party. There were no children of the marriage. On or about March 2, 2010, Ex-Husband

filed the within complaint, requesting a divorce and resolution of ancillary claims. Ex-Husband then filed a petition to bifurcate the divorce from the ancillary claims. The petition was ultimately unopposed and, accordingly, on September 18, 2012, this court granted the petition for bifurcation and entered a decree of divorce.

A special master in divorce was then appointed. The master held a hearing on March 14, 2013, then issued a report dated April 15, 2013. In the report, he found equitable distribution to be the only issue for disposition, recommending that the marital assets be distributed, with seventy-five percent (75%) of the assets being awarded to defendant, Joan A. Dean (hereinafter "Ex-Wife"), and twenty-five percent (25%) to Ex-Husband. To accommodate this percentage of distribution, the master awarded the marital residence to Ex-Wife and recommended that she pay Ex-Husband the sum of seventeen thousand three hundred sixty-six dollars and fifty cents ($17,366.50), providing several payment options. Ex-Husband then filed exceptions to the special master's report. This court held argument on August 28, 2013, and on October 24, 2013, denied Ex-Husband's exceptions.

In his statement of the errors complained of on appeal, Ex-Husband raises the following issues:

1. [Ex-Husband] excepts to the divorce master's application of the coverture fraction to determine the value of the marital residence for the purposes of the equitable distribution and [Ex-Husband's] interest therein.

2. [Ex-Husband] excepts to the divorce master's calculations of the value of the subject marital assets.

3. [Ex-Husband] excepts to the divorce master's finding that estate planning of [Ex-Husband] and [Ex-Wife] in 2002 resulted in a quasi-postnuptial agreement addressing distribution of the marital residence upon their divorce. [sic] Especially since both parties testified that in 2002 they did not anticipate getting divorced.

4. [Ex-Husband] excepts to the divorce master's finding and considering that by executing a new will, following the parties' separation and excluding [Ex-Wife] therefrom, [Ex-Husband] somehow breached an alleged agreement.

5. [Ex-Husband] excepts to the divorce master allowing and considering any testimony regarding the alleged marital misconduct by [Ex-Wife].

6. [Ex-Husband] excepts to the recommendation of the divorce master to allow [Ex-Wife] to pay [Ex-Husband's] share of the marital assets upon her death since such recommendation could result in [Ex-Husband] receiving none of the marital assets and, thereby, it is contrary to the principals of equitable distribution.

7. This honorable court also abused its discretion and/ or committed an error of law by denying [Ex-Husband's] motion for sanction [sic] as it was perfectly clear from the record that [Ex-Wife] and [Ex-Wife's] mother, the intervener [sic], have made false statements pertaining to material issues in this action.

"[A] master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties." *Moran*

*v. Moran*, 839 A.2d 1091, 1095 (Pa. Super. 2003) (citing *Simeone v. Simeone*, 380 Pa. Super. 37, 551 A.2d 219, 225 (1988), *affirmed* 525 Pa. 392, 581 A.2d 162 (1990)).

## I. Application of Coverture Fraction

## II. Calculation of Value of Marital Assets

In making equitable distribution, the master identified only two (2) assets of significance, the marital residence and a cabin used by the parties for vacation purposes. Further, the cabin was sold and the proceeds distributed by agreement of the parties, each receiving approximately nine thousand dollars ($9,000.00) from the sale.

The marital residence was purchased in 1995 for one hundred twenty-two thousand dollars ($122,000.00). The master found that the current fair market value was one hundred eighty-one thousand dollars ($181,000.00), reaching this figure by averaging appraisal values submitted by the parties' appraisers in written reports. The master then discounted fair market value by seven percent (7%) "to account for the expenses to be incurred upon sale of the property," resulting in a net balance of one hundred sixty-eight thousand three hundred thirty dollars ($168,330.00). As there were no liens on the residence, the entire balance was available for distribution.

An additional consideration for the master was an estate plan entered into by the parties sometime in 2002 regarding the marital residence. At that time, Ex-Wife sought to get cooperation from Ex-Husband to allow her children to inherit the marital residence. The parties then executed certain documents, namely, Ex-Husband's execution of a deed conveying his interest in the marital

residence to Ex-Wife, and the execution of mutual wills setting forth, among other things, that if Ex-Wife died first and if the parties were still married at the time of her death, the marital residence was to be sold, with the first eighty thousand dollars ($80,000.00) of the proceeds to be distributed to her children, and the remaining funds to be distributed to Ex-Husband. The parties executed the wills on April 16, 2002. The deed was executed by Ex-Husband on May 13, 2002.

Also significant to the analysis was the fact that Ex-Wife was solely responsible for the financing of the residence. At the time of purchase, Ex-Wife borrowed seventy-two thousand dollars ($72,000.00) from a bank and obtained an additional thirty-two thousand dollars ($32,000.00) from a swing loan. She also withdrew twenty-five thousand dollars ($25,000.00) from her employment savings plan and utilized proceeds from the sale of her former residence, totaling eight thousand six hundred thirty-seven dollars and nineteen cents ($8,637.19). Subsequently, in 2003, Ex-Wife paid off the balance due on the residence with monies she obtained when she retired from her employment at AT&T, having received a lump sum of eighty-four thousand seven hundred fifty-eight dollars and twenty-six cents ($84,758.26). Also of note, Ex-Wife financed some improvements to the premises, adding a new deck, remodeling two (2) bathrooms, and completing improvements to the basement.

The master then found that only a portion of the value of the marital residence should be deemed marital property, because Ex-Wife utilized both marital and non-marital funds in paying off the mortgage. The master utilized the "vanishing credit" theory for the proposition

that under certain circumstances, a spouse may be entitled to a credit in equitable distribution for the value of non-marital property transmuted to the marital estate, citing *Lee v. Lee*, 978 A.2d 380, 383 (Pa. Super. 2009), and *Sergi v. Sergi*, 506 A.2d 928 (Pa. Super. 1986).

In this context, the master found that Ex-Wife should receive a credit of eight thousand six hundred thirty-seven dollars ($8,637.00) for her contribution of the proceeds of the sale of her former property. This figure was subtracted from the net balance of the value of the premises of one hundred sixty-eight thousand three hundred thirty dollars ($168,330.00), leaving a new balance of one hundred fifty-nine thousand six hundred ninety-three dollars ($159,693.00).

Secondly, the master determined that distribution of the residue of the assets, the net value of the marital residence, should be resolved in the same manner as would have taken place if Ex-Wife had retained her retirement fund for, in essence, she substituted the value of the fund for an increase of value of the equity in the residence. Because Ex-Wife's retirement fund was accrued over thirty-nine (39) years of employment, with seventeen (17) of those years taking place during the marriage to Ex-Husband, the master calculated a coverture fraction of 17/39 or 43.58%. Applying this fraction, the master found that the marital portion of the residence equaled sixty-nine thousand four hundred sixty-six dollars ($69,466.00).[1]

From this net figure, the master then considered all equitable distribution factors. He noted that Ex-Wife

---

1. The actual figure should be sixty-nine thousand five hundred ninety-four dollars and twenty-one cents ($69,594.21).

was almost solely responsible for the purchase of the marital residence. It was also true that Ex-Husband had contributed very little to the parties' household expenses, offering only one hundred dollars ($100.00) per week for household expenses, and a contribution toward the electric bill, as well as some initial contributions to the remodeling of the basement. Considering the fact that Ex-Wife "has invested, literally, her life savings in the property," and also taking into account the parties' ages, health, residual debt, the fact that it is a third marriage for both, and is a relatively lengthy marriage, the master concluded that Ex-Husband should receive twenty-five percent (25%) of the net value, which he calculated to be seventeen thousand three hundred sixty-six dollars and sixty-five cents ($17,366.65).[2]

Ex-Husband's first exception, disputing the propriety of applying the coverture fraction to the value of the marital residence, is based on the principle that gifts between spouses are marital.[3] Thus, the marital residence is marital property, even after Ex-Husband deeded the residence over to Ex-Wife. Likewise, when Ex-Wife used the non-marital portion of her retirement fund to pay off the mortgage on the marital residence, it constituted a gift to Ex-Husband of the non-marital asset.

Under these unique facts, this court agrees with the master's determination that application of the coverture

---

2. The actual net figure should be seventeen thousand three hundred ninety-eight dollars and fifty-five cents ($17,398.55).

3. 23 Pa.C.S.A. §3501(a)(3) sets forth, in pertinent part:
*(a) General rule.* — As used in this chapter, "marital property" means all property acquired by either party during the marriage.... However, marital property does not include: .... (3) Property acquired by gift, except between spouses....

fraction was appropriate considering the contextual circumstances and the principles of equity.

As stated, Ex-Wife's purpose in entering into this estate plan was to ensure that her children received a cash settlement from the sale of the marital residence, if she predeceased Ex-Husband. If the estate plan had not been put in place, and Ex-Wife had died, the marital residence would have passed to Ex-Husband by operation of law. Apparently, in consideration of Ex-Wife's financing, the purchase of the residence and the sharing of the household expenses, the parties agreed that Ex-Wife would become sole owner of the residence and Ex-Husband's only interest in the residence going forward would be through the inheritance in Ex-Wife's will. Further, the inheritance would be residual, with her children assuming a priority position for the proceeds of the sale of the residence, in accordance with the terms of the will.

With this understanding, a year later, Ex-Wife, at the time of her retirement, chose to pay off the remaining obligations on the residence through funds she received from her retirement. In essence, Ex-Wife traded income she would receive in the future through her retirement for an increase in her present day cash flow by paying off the mortgage. The payment on the mortgage included non-marital funds as so found by the master.

Accordingly, Ex-Wife's decision to use non-marital retirement funds to pay off the mortgage on the residence was not meant to be a gift to Ex-Husband but was merely to arrange her assets and income in a manner she saw fit. Her contemplation was that the marriage would continue, and that Ex-Husband's only interest in the residence

would be through the inheritance. The divorce resulted in a change of circumstances, with the wills no longer having any effect, as will be more fully discussed later, and Ex-Husband being legally permitted to claim an interest in the marital residence as part of the marital estate. Nevertheless, the intentions of the parties in entering into the estate plan, and Ex-Wife's subsequent actions in furtherance of her understanding of her legal position relative to the estate plan, created circumstances which must be considered. The master did so consider and determined that it would be most equitable to trace the source of the funds used to pay off the residence, with the funds to retain their original pedigree. Finding this analysis to be equitable, this court dismissed Ex-Husband's exception.

Regarding the second exception, the master applied the statutory factors required by Section 3502(a) of the divorce code, 23 Pa.C.S.A. § 3502, finding that a distribution of seventy-five percent (75%) to Ex-Wife and twenty-five percent (25%) to Ex-Husband was reasonable. Of great significance was the contribution of the parties to the marital estate. As stated, Ex-Husband contributed very little, namely, one hundred dollars ($100.00) per week toward household expenses and some figure toward the electric bill. One hundred dollars ($100.00) per week is equivalent to a little over fourteen dollars ($14.00) per day, not sufficient to even pay the costs of Ex-Husband's personal needs. In essence, Ex-Wife paid for the marital residence, all the joint expenses, her own living expenses, and probably contributed something toward Ex-Husband's living expenses. This arrangement went on for several years. Accordingly, this master found, and the court agrees, that this factor should be weighed heavily in favor of Ex-

Wife. With that in mind, and considering the other factors, including the parties both being on a fixed income, the age of the parties, and other factors more specifically outlined in the master's report, this court found that the master was within his discretion in the percentage of distribution he reached. Accordingly, this court dismissed Ex-Husband's exception number 2.

### III. Estate Planning/Post-Nuptial Agreement

As stated, the parties had engaged in estate planning, executing mutual wills, with Ex-Husband agreeing to deed the marital residence over to Ex-Wife. Ex-Husband maintains that this plan did not create any agreement which allows Ex-Wife to remain in the marital residence until her death. Ex-Husband claims the master misconstrued Ex-Husband's argument concerning the wills. Ex-Husband did not argue that the wills created an agreement between the parties, or that they control the equitable distribution of the marital assets. Instead, it was Ex-Wife who argued that the wills and deeds created an implied agreement allowing Ex-Wife to stay in the marital home until her death.

The master concluded that any agreement the parties may have had concerning the marital residence pursuant to the parties' wills terminated at the time of the divorce. "The divorce decree previously entered in this matter extinguished any right or claim that each party may have had against the other or the other's estate" (master's report and recommendation, eleventh page). The master cited 23 Pa.C.S.A. Section 3503, which provides that upon divorce "all property rights which are dependent upon the marital relation, except those that are vested rights, are terminated...." He also looked to article fourth of Ex-

Wife's will which distributes her residuary estate: "A. To my spouse, Thomas A. Dean, if my spouse survives me." The master concluded that Ex-Wife intended to make a gift to her spouse. Because Ex-Husband is no longer Ex-Wife's spouse, the gift to Ex-Husband under the residuary clause lapses and is null and void.

Finally, any obligations under the alleged agreement are discharged because of legal impossibility. In *Luber v. Luber*, 614 A.2d 771 (Pa. Super. 1992), defendant husband contended that his performance under an oral property settlement agreement he had with plaintiff wife and placed on the record before the master, should be excused due to legal impossibility. He contended that his financial situation prevented him from honoring the agreement. The court rejected this assertion, but discussed the doctrine of legal impossibility.

> Legal impossibility or impracticability is defined in Section 261 of the Restatement (Second) of Contracts. *See Craig Coal Mining Co. v. Romani*, 355 Pa. Super. 296, 513 A.2d 437 (1986), *appeal granted*, 514 Pa. 624, 522 A.2d. 50 (1987). This section states:
>
> Section 261. Discharge by Supervening Impracticability.
>
> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basis assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate to the contrary.

....

The theory of legal impossibility or impracticability is based on an objective standard and will not apply if a performance remains practicable and is merely beyond a particular party's capacity to render it. § 261 of the Restatement (Second) of Contracts, comment e; *Dorn v. Stanhope Steel, Inc.*, 368 Pa. Super. 557, 534 A.2d 798 (1987), *appeal denied*, 518 Pa. 656, 544 A.2d 1342 (1988).

*Id.* at 774.

Here, by operation of law, it is legally impossible for any agreement, memorialized through the parties' wills, to be enforced due to the terms of Section 3503 of the divorce code. Thus, whether or not the parties intended an agreement concerning the marital residence, the circumstances and application of the divorce code relieved the parties from performing because this performance is legally impossible. Exception 3 was, therefore, denied.

## IV. Whether Ex-Husband's Execution of a New Will Following Separation Breached an Alleged Agreement

After separation, Ex-Husband executed a new will, excluding Ex-Wife as a beneficiary. The master found that, even assuming the estate planning agreement would somehow be valid and binding after the divorce decree was entered, Ex-Husband would not be permitted to rely on that agreement because his execution of a new will constituted a breach of the agreement. The master states:

...It would be anomalous and unfair to expect [Ex-Wife] to abide by the terms of her Will, including the provision benefiting her "spouse," yet allowing [Ex-Husband] to completely disown [Ex-Wife] in his

Will. The master will not allow [Ex-Husband] to take advantage of the fact that the parties are divorced and deny [Ex-Wife] the same advantage....

The promise to execute mutual wills and the subsequent preparation and execution of those wills meets the requirements of a valid contract. However, it is also true that "A material breach of contract relieves the non-breaching party of any continuing duty of performance under the contract." *Umbelina vs. Adams*, 34 A.3d. 151, 159 (Pa. Super. 2011), *appeal denied.*

[Master's Report, thirteenth page.]

This court agrees with the master that Ex-Husband's execution of the new will relieves Ex-Wife of any obligation to perform under the terms of her will. Accordingly, this court denied this exception.

V. Consideration of the Issue of Marital Misconduct

In the master's report, the following references are made on the issue of marital misconduct. First, on the sixth page of the report is a finding of fact stipulated to by the parties, setting forth:

31. Wife asked Husband to vacate the marital residence on February 1, 2010 alleging that he engaged in marital misconduct....

The second reference is on the seventh page, finding of fact by the master, which sets forth:

14. Husband's misconduct led to the parties' separation.

Ex-Husband's argument, that the master erred by allowing and considering testimony regarding alleged

marital misconduct, is without merit. First, one of the issues raised by Ex-Husband, as set forth in this court's order of May 2, 2012 appointing the master, was the issue of alimony. Marital misconduct is a factor to be considered in determining whether alimony should be allowed, 23 Pa.C.S.A. § 3701(b)(14), and therefore, allowing testimony on the issue was appropriate. Secondly, it is apparent from his report that the master did not consider marital misconduct in making his findings on equitable distribution. He gave stated reasons for each of his rulings, none of which included the issue of marital misconduct. Further, on the seventh page, he cites 23 Pa.C.S.A. § 3502(a) regarding the statutory factors for equitable distribution and specifically states that equitable distribution should be determined "without regard to marital misconduct." Accordingly, this court denied Ex-Husband's exception.

## VI. Payment to Ex-Husband of his Share of the Marital Assets

In his proposed decree, the master set forth that Ex-Wife should pay to Ex-Husband the sum of seventeen thousand three hundred sixty-six dollars and fifty cents ($17,366.50). He then goes on to state that [Ex-Wife] shall have the option of making such payment as follows:

a. [Ex-Wife] may defer payment either until the sale of the subject property or upon her death by executing a note in the aforesaid amount which note shall be recorded and act as a lien against the property.

b. Payment of the entire sum within ninety (90) days.

c. Payment of Five Thousand Dollars ($5,000.00)

within ninety (90) days with the balance to be paid in equal installments. The balance shall be paid with 6% interest until final payment. There shall be no penalty in the event that [Ex-Wife] is willing and able to make final payment prior to the time the final installment would normally be due.

In his report, the special master sets forth his rationale for providing Ex-Wife these alternate options:

The master recommends that [Ex-Wife] be able to retain and reside in the marital residence either until she decides to sell it or until her death. This appears to have been the intent of the parties during their marriage. Moreover, given the fact that the property has been [Ex-Wife's] primary residence since it was purchased and that she has invested, literally, her life's savings in the property it would be inequitable to require her to vacate and sell the property to satisfy any award to [Ex-Husband].

On the other hand, as the findings indicate, neither party has a substantial income, savings or access to a [sic] significant retirement funds. Therefore, it becomes problematical how [Ex-Wife] is going to be able to afford to pay [Ex-Husband] his share of the marital estate. This is especially true since [Ex-Wife] already has a home equity loan outstanding in the amount [of] approximately $40,000.00 which makes it difficult for her to borrow additional funds.

The master will offer [Ex-Wife] a number of options in order that [Ex-Husband] receives the funds to which the master believes he is entitled. First, [Ex-Wife]

may execute a note in the appropriate amount plus the current statutory rate of interest. The note would act as a lien against the property and be paid upon [Ex-Wife's] death or at the time of any sale of the home.

Secondly, [Ex-Wife] may attempt to borrow the funds and pay [Ex-Husband] a lump sum in the amount of $17,693.00. This should be done within ninety (90) days of the entry of a decree in divorce. In the event that [Ex-Wife] should be unable to borrow this amount she may pay the sum as follows: Five Thousand Dollars ($5,000.00) within 90 days of the entry of a decree in divorce and the balance, with interest at the present rate, over a period of three years in equal payments. If this final option is selected, [Ex-Wife] shall have the option of paying the balance of $13,693.00 in a period less than three years.

As Ex-Husband suggests, an argument could be made to require Ex-Wife to make periodic payments in some amount if she cannot afford to make a lump sum payment to ensure that Ex-Husband ultimately receives his share of equitable distribution. This court finds, however, that the master's rationale, considering the facts and circumstances, was reasonable and the master was, therefore, within his discretion in providing Ex-Wife with the option of deferring the payment until the sale of her home or upon her death, secured through execution of a note. Accordingly, this exception was denied.

## VII. Motion for Sanctions

Ex-Husband's motion for sanctions claims that Ex-Wife, or her mother, Violet Godfrey, (hereinafter "Ms. Godfrey"), or both, violated Pa.R.C.P. 1023.1, governing,

among other things, representations made in discovery. Ex-Husband argues that Ms. Godfrey made certain factual statements in a petition she filed to intervene in the within divorce action, that both she and Ex-Wife executed verifications to the petition, setting forth that the facts in the petition were true and correct, that at a subsequent deposition on November 7, 2012, Ms. Godfrey testified under oath and made statements which "contradicted all the material representations made" in the petition to intervene, that these contradictions could not be reconciled and that, therefore, Ms. Godfrey, Ex-Wife or both, made false statements and should be subject to sanctions.

In his motion for sanctions, Ex-Husband considered the following averments in the petition to intervene to be germane:

5. [Ms. Godfrey], in about March, 2008, moved to her present residence at 204 Mountainside Road, Temple, PA. She moved there pursuant to the agreement of [Ex-Husband] and [Ex-Wife] that she would be able to live there for the rest of her life. In consideration of her moving to the present residence, she made contributions as requested by [Ex-Husband] to the expenses of the marital residence that [Ex-Husband] was otherwise contributing to.....

9. [Ms. Godfrey] asserts that she has a right to live at 204 Mountainside Road, Temple, PA for the rest of her life pursuant to the understandings and agreement with [Ex-Husband] and [Ex-Wife].

10. [Ms. Godfrey], in reliance upon the representations of [Ex-Husband] to her financial detriment, left her

former residence and financially changed her position.

The pertinent portions of Ms. Godfrey's deposition testimony are as follows:

[N.T. p. 6.]

Q Okay. And what made you decide to move to 204 Mountainside Road?

A Because my granddaughter was engaged, and I thought they were going to get married. And I thought I better find my own place. But then [Ex-Wife] said: Mom, you're coming with me now....

[N.T. pp. 7-8.]

Q So it was you and [Ex-Wife] that had the conversation about you moving to 204 Mountainside Road?

A Yes....

Q Okay. And that time, did you have any conversations with [Ex-Husband] about moving into the residence?....

A It had to be her to ask him about moving, that I could move in.

Q Okay. Okay. And then you got a confirmation that you can move in?

A Yes.

Q Okay. At that time, were you asked to pay rent?

A Well, I pay, I gave something like I did before, you know, at the other place.

Q So around —

A So then I gave [Ex-Wife] 4, them 400.

Q Is this something that you offered to pay?

A Yes. She didn't say what I had to do. But I wouldn't live there for nothing.

Q Okay. Okay. And when you moved into the residence at 204 Mountainside Road, was there, were there any promises made to you as far as how long you can stay there?

A No.

Q No promises?

A No.

Q Okay.

A I figured I'd stay there until I went to heaven.

[N.T. p. 9.]

Q And who did you give that [$400] to?

A I gave it to [Ex-Wife].

[N.T. pp. 13-14.]

Q Earlier I asked you if you were, there were any promises made to you as far as how long you can stay in the residence, and you said no. Am I correct?

A I'm not sure now about that. Because I figured that was my home until I went to heaven.

Q I also asked you if you made that assumption that you would stay there until that time?

A Yes, yes.

Q But you also, I asked you specifically if it was your assumption but no promises were made; and you agreed with me that no such promises were made?

A It wasn't, I made that myself.... That's what I said.

Q Okay. And then when [Ex-Husband] moved out in 2010, you stopped paying $400 a month?

A Yes. [Ex-Wife] said if I just give her 50 towards the food and stuff.

Q Okay. So the change wasn't caused by [Ex-Husband] leaving, it's just an agreement between you and your daughter?

A Yes....

[N.T. pp. 14-15.]

Q — did you ask [Ex-Wife] to decrease those monthly payments?

A No, she did it.

Q She offered to do so?

A Yes.

Q Did she explain to you why?

A Well, she said she didn't think I'd had to pay that much, $400 per month.

Q And do you know why she said that?

A Well, because in the beginning, I know something

would have been said that I would have lived there for nothing if he was there.

Q I'm sorry?

A If something wouldn't have been said like if he was there, I know I wouldn't have lived there for nothing. Because she would have had to hear about it.

Q But is this something because, is this something that you just assumed?

A I did, I did.

Q So no one really told you to make those statements?

A No, no, they didn't.

Q And no one, especially [Ex-Husband], never told you you cannot live there unless you make those payments?

A No.

In the case of *Commonwealth ex rel. Fisher v. Jash International, Inc.*, 847 A.2d 125, 134 (Cmwlth.Ct. 2004), the Commonwealth Court set forth that common pleas courts have significant discretion in determining whether to impose sanctions pursuant to Pa.R.C.P. 1023.1. The court also noted that "sanctions should be granted sparingly lest they have a chilling effect on the right of all parties...to litigate a controversy to conclusion."

The commentary to Pa.R.C.P. 1023.1 provides a list of factors that a court may consider in determining whether sanctions would be appropriate. These include: whether the improper conduct was willful or negligent, whether it was part of a pattern of activity or an isolated event, whether

it infected the entire pleading or only one particular count or defense, whether the person has engaged in similar conduct in related litigation, whether it was intended to injure, what effect it had on the litigation process in time or expense, whether the responsible person is trained in the law, what amount is needed to deter that person from repetition in the same case, and what amount is needed to deter similar activity by other litigants.

This court found Ex-Husband's motion to be unwarranted, even considering the factual averments in the light most favorable to Ex-Husband. For one, the nature of the relief sought by Ms. Godfrey, and the timing of the filing of Ex-Husband's motion, establish that Ex-Husband's purpose in filing the motion was not to protect his interests or due to prejudice against his case, but was punitive in nature, filed simply to obtain punishment against Ex-Wife and/or her mother. Secondly, under the facts and circumstances, the offense alleged was not sufficiently egregious to warrant sanctions.

In her petition to intervene, Ms. Godfrey sought to preserve an interest she alleged she had in the marital residence. In essence, Ms. Godfrey became concerned that she may be required to move from the residence after Ex-Husband began asserting claims to the marital residence.

Whether Ms. Godfrey's claim was in the form of a lease agreement or a life estate, the claim was collateral to the divorce. As stated, Ex-Husband had deeded the residence over to Ex-Wife prior to the institution of divorce proceedings. Given that fact, and the fact that Ex-Wife had purchased the residence with her funds and financing, it was extremely unlikely that Ex-Husband would be

awarded the marital residence by the special master or by the court. The filing of the petition to intervene, the averments alleged within the petition, the granting of the petition, and the subsequent deposition of Ms. Godfrey, had no effect on Ex-Husband's claims under the divorce.

The petition to intervene was filed on August 8, 2012. By agreement, the petition was granted on October 3, 2012. The deposition of Ms. Godfrey was conducted on November 11, 2012. Ex-Husband filed his motion for sanctions on April 30, 2013, several months after he would have become aware of any inconsistencies in the statements made. Further, the motion was not filed until after the master filed his report on April 15, 2013, and was filed concurrently with Ex-Husband's notice of exceptions. At this late juncture, Ex-Husband's motion could not have been filed to resolve discovery disputes, to ensure compliance with discovery, or to otherwise protect his interests. Having hard feelings from the alleged inconsistencies in the statements, and apparently further aggravated by the master's report, Ex-Husband, simply put, sought retribution.

Ex-Husband's motives aside, there is still a question on whether misrepresentations were made to the court. From the testimony, it appears that Ms. Godfrey, a 97 year old woman, sought to live out the remainder of her days in the marital residence, with her daughter. In part, from her sense of responsibility to "pay her own way" and, in part, because she believed that Ex-Husband might be upset with Ex-Wife if she lived there for free, Ms. Godfrey paid four hundred dollars ($400.00) per month, the same arrangement that she had made with her granddaughter when she resided at her home. She was

under the impression that Ex-Husband was aware of the arrangements and either consented or acquiesced to them.

The averments in Ms. Godfrey's petition to intervene set forth that Ex-Husband had "requested" financial "contributions" and that there was some type of formal understanding that Ms. Godfrey would be permitted to reside in the marital residence for the remainder of her life. It is true that these averments are not precisely accurate. That being said, the averments do not appear to be diametrically opposed to the truth. While Ex-Husband may not have specifically requested the contribution, Ms. Godfrey was under the impression that she would not be permitted to live there without making such a contribution. While there may not have been a specific agreement with Ex-Husband that Ms. Godfrey would be permitted to reside at the residence for the rest of her life, it was certainly Ms. Godfrey's desire and expectation, and given her age and the other facts and circumstances, including the difficulty of evicting a 97 year old woman from her home, it was not unreasonable for Ms. Godfrey to conclude that she and Ex-Husband had an understanding.

Discovery is a tool used to insure a level playing field in litigation through the sharing of information. The rules for discovery ensure fair dealing in this pre-trial process. When a person fails or refuses to honor these rules, it can cause delays in time, needless expense, or other substantial harm to the other litigant. To protect against this, the court has the ability to impose sanctions. As is apparent from the list of factors in the comments section, the sanctions are designed to provide redress, when necessary, and to deter others from also engaging in these improper actions. The factors also set forth that the court should review

the nature of the conduct, whether it was intentional or negligent, whether it was an isolated incident or recurring, or whether the intention was to injure the other party. Of course, the actual effect on the litigation must be considered. For reasons set forth, this court found that the conduct complained of was insubstantial and did not affect the proceedings in any manner. Further, Ex-Husband's conduct in filing the motion, after the case had been decided, was unnecessary and vexatious. The motion for sanctions was, therefore, denied.

This court requests that your honorable court affirm this court's decision entered October 24, 2013, and dismiss the appeal of Thomas A. Dean.